Benjamin Goodman and Anna Goodman v. Commissioner. Harold Goodman v. Commissioner.
Goodman v. Comm'r
Docket Nos. 43543, 43544.
United States Tax Court
T.C. Memo 1961-201; 1961 Tax Ct. Memo LEXIS 156; 20 T.C.M. (CCH) 997; T.C.M. (RIA) 61201; June 30, 1961
Harold R. Burnstein, Esq., for the petitioners. Paul Levin, Esq., and Julian L. Berman, Esq., for the respondent. HARRON *156 Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income taxes and 50 percent additions to the deficiencies under section 293(b), 1939 Code, as follows: Docket
Nos.
Petitioners
Years
Deficiencies
Sec. 293(b)
43543
B. and A. Goodman
1946
$ 1,616.94
$ 808.47
43543
B. and A. Goodman
1947
2,764.64
1,382.32
43544
Harold Goodman
1947
81,462.65
40,731.33 The *157 respondent has made claims under section 272(e) for increases in the deficiencies and the 50 percent additions in both cases. The issues for decision are whether Benjamin and Anna Goodman, for 1946 and 1947, and Harold Goodman, for 1947, failed to report all of their income. If it is found that there are deficiencies, there is the additional question in each case whether part of a deficiency was due to fraud with intent to evade tax. Findings of Fact The petitioners are residents of Chicago, Illinois. Benjamin and Anna Goodman filed joint returns; Harold Goodman filed an individual return; the returns were filed with the collector of internal revenue for the first district of Illinois. Harold is a son of Benjamin and Anna Goodman. Benjamin Goodman and Anna Goodman were born in Russia, in 1888 and 1897, respectively. Anna came to the United States in 1906. Benjamin came here in 1910, at which time he was about 22 years old. Both went directly to Chicago and have lived there continuously except for short periods. They were married in 1915. They have 4 sons. Harold was born in 1919; Oscar in 1921; Ernest, in 1930; and Melvin, in 1931. All of the sons are unmarried except Ernest. *158 Benjamin received very little education in Russia, and none in the United States. He is unable to read English except when words are printed, and he speaks English with difficulty. He reads and speaks Yiddish. In 1945 he became almost totally deaf. In 1937, his hearing was so impaired that he used a hearing aid. He has relied at all times on his wife and sons to give him assistance in matters involving reading, writing, and the signing of documents. Anna's father had a grocery store business. She attended public schools in Chicago, through grammar school, until she was 15 years old. She was a self-employed dressmaker from 1915 until 1938 when she was employed by a clothing manufacturer. She received a dowry of $15,000. Anna had a sister, Sara Faber, who was born in Russia in 1894 and came to the United States in 1905 or 1906. She lived in Chicago and was employed by a clothing manufacturer. She is referred to hereinafter. Benjamin was a harness maker and upholsterer before he came to the United States. After arriving in Chicago, he worked as a harness maker and sold merchandise as a peddler. In 1911 he was employed by the Illinois Central Railroad, at its Burnside Shop in *159 Chicago, as an upholsterer. Except for about 2 years, 1918-1920, Benjamin worked for the Illinois Central Railroad until it closed its shop in Chicago in 1930. He then became self-employed as an upholsterer and a dealer in second-hand stoves and iceboxes. Benjamin did various kinds of work such as carpentry, painting, bricklaying, roof repairing, and general repair work. He also did the work of janitor, carpenter, and painter in apartment buildings which he and Anna owned. He is an all-around handyman. In the summer of 1942, Benjamin was employed by the Pullmanstandard Company which was making airplane parts for Douglas Aircraft. Benjamin was employed as a riveter. He worked there until the autumn of 1945. His earnings at Pullman Standard were as high as $6,500 a year. After leaving Pullman Standard, Benjamin worked as a janitor, carpenter, and painter in the buildings which he and his wife owned; he did all of the painting and maintenance work in the apartment buildings. In his income tax return for 1946, he described his occupation as "Handyman-Decorator". In his return for 1947, he stated that his occupation was "Handyman and Real Estate". In his return for 1948, he stated *160 that his occupation was "Handyman, Janitor, Real Estate". Benjamin was self-employed after leaving the Pullman Company in 1945. During the period 1918-1921, Benjamin and Anna purchased and operated retail stores. In 1918, Benjamin and Anna purchased a clothing store in Koutz, Indiana. They sold this store and business in 1919 and returned to Chicago. Their profits from this business were about $5,000. They purchased a small grocery store business in Chicago which they operated for about 9 months and then sold. They then purchased a larger grocery store business which they operated until sometime in 1921 when they sold the business. Their profits from the operation of the grocery stores were about $8,000. Anna worked with her husband in the conduct of all of these retail business ventures, and she also worked in the management of apartment house properties owned by herself and her husband. At all times, the Goodmans worked industriously at various kinds of income-producing activities; they lived frugally. They lived in an apartment building which they owned; Anna made clothing for herself and her family; she preserved food; she did her own baking and cooking. In 1916, one year *161 after their marriage, the Goodmans purchased a lot and built a three-flat building at 6152 South Aberdeen Street, Chicago. The building cost $18,000. They invested $15,000 of their own cash and borrowed $3,000. They lived in one of the flats and rented the other 2 flats. Benjamin did all of the janitor and maintenance work. The Goodmans owned and operated this apartment property until sometime in 1931, a period of about 15 years. At some time before 1930, they refinanced the mortgage. Principal payments on the $3,000 mortgage were not required and were not made. A new mortgage loan of $7,000 was obtained from the Chicago City Bank through which the Goodmans realized the net sum of $4,000, after paying the $3,000 mortgage loan. During the depression in the late 1920's and 1930's, the Aberdeen property did not do well. Also, Negroes moved into the neighborhood. The Goodmans decided to get rid of the property. Having made that decision, they refrained from putting any more money into the property. They paid mortgage interest but did not pay anything to reduce the mortgage indebtedness; they did not pay real estate taxes and assessments; finally they defaulted in interest payments. In *162 1931, they sold their equity in the property to the Chicago City Bank for $600. The second apartment property owned by the Goodmans is the 81st & Loomis property, which they still own. They purchased a lot at 8100 South Loomis Street, Chicago, in May 1918 (about 3 years after their marriage) for $1,450. They held the unimproved lot until 1924. In December 1924 they obtained a 5-year, 6 1/2 percent mortgage loan of $42,500 for the construction of a building, which was started in 1924 and was completed in 1925. A 12-apartment building was constructed at a cost of $75,000, to which the above loan was applied and the balance, $32,500, came from the Goodmans' savings and resources. The Goodmans moved into a 5-room apartment in the Loomis Street building in 1925. They have lived there since then. They rented the other 11 apartments. Benjamin, Anna, and their older children did all of the management and maintenance work. Benjamin did the chief janitor work; he was assisted by Anna. He also did all of the painting, decorating, carpentry, roof work, and general maintenance work. In addition, he had a shop in the basement where he worked in his spare time and when he was self-employed. In *163 that shop he upholstered furniture, repaired and reconditioned stoves and iceboxes, and did other miscellaneous jobs. From 1925 through 1945 (up to the first taxable year, 1946), a period of close to 20 years, the Goodmans rented apartments in the Loomis Street property. During part of the same period, until sometime in 1931, they also rented apartments in the Aberdeen Street property. As of November 18, 1929, the mortgage loan secured by a mortgage on the Loomis Street property had been reduced from $42,500 to $30,000; i.e., mortgage payments had been made in the amount of $12,500. On the above date, the Goodmans refinanced the mortgage loan. They obtained a loan of $30,000 from the New York Life Insurance Company at a lower rate of interest, namely, 6 percent. They paid the balance due on the original mortgage loan. As of December 5, 1941, the mortgage loan of New York Life had been reduced to $22,500. Until some time in 1938, Anna was self-employed at home as a dressmaker. In 1938, Anna was employed by Rothmoore Corporation, a clothing manufacturer in Chicago, as an electric sewing machine operator. She worked there continuously until about February 1945. Her sister, Sara *164 Faber, was also employed there. Anna earned from $1,025 to close to $2,000 a year. Her total earnings at Rothmoor during the years 1938-1945 were $9,651.38, from which $489.45 was withheld for taxes. The sons of the Goodmans went to work at early ages, working at odd jobs. Oscar sold newspapers when he was 10 years old. All of the sons helped their parents in various ways, particularly with maintenance and repair work at properties owned by the Goodmans. Harold, Oscar, and Melvin attended Northwestern University at Evanston, Illinois. Ernest studied law at the University of Chicago. He married in 1952. All worked their way through college and obtained loans and scholarships. Harold entered the University in September 1936 and graduated in June 1940 from the School of Commerce. He received the B.S. degree. He became a certified public accountant in Illinois in March 1942. Oscar entered the University in September 1940 and graduated in June 1943; he majored in business administration; he received the B.S. degree. Later, in the years 1947-1952, Oscar taught economics at the University of Wisconsin. He received the Ph. D. degree in 1952. Subsequently, Oscar became a professor of *165 economics at Washington State College. Melvin studied medicine. Harold and Oscar, the older sons, also worked during summer vacations. They turned over some of their earnings to their parents. Five policies of life insurance were issued on the life of Benjamin Goodman. The dates when the policies were issued, the face amount of each policy, and the name of the insurer are as follows: Date of
Policy
Insurer
Amount
1.
5- 9-19
New York Life
$1,000
2.
7-30-29
Ohio National Life
1,000
3.
9-15-34
New York Life
3,000
4.
9-15-34
New York Life
2,000
5.
4-19-38
Metropolitan Life
2,000
A life insurance policy was issued on the life of each of the Goodmans' sons, Harold, Oscar, and Earnest. The date on which each policy was issued, the amounts, and the insurers are noted below: Date of
Policy
Insurer
Insured
Amount
6.
9-25-28
Monumental
Harold
$1,000
7.
12-23-30
Monumental
Oscar
1,000
8.
11-24-39
John Hancock
Ernest
1,000
During the years 1930-1945, Benjamin borrowed money on all of the 8 insurance policies. All of the loans were repaid during the years 1933-1946. The Goodmans, for the *166 most part, carried on all of their business transactions and all other dealings in cash. They did not keep any written accounting records or any kind of informal records of their cash receipts and disbursements at any time, including the taxable years. The few bank accounts of Benjamin, Anna, and other members of the family are referred to hereinafter. The Goodmans did not file any income tax returns prior to the year 1942. At some time before 1931, the Goodmans had a bank account in the West Highland State Bank in Chicago. It failed in 1931, and the Goodmans lost the amount which they had on deposit when the bank closed. Thereafter, they did not have, or use, a checking account in any bank until March 1942 when Harold and Oscar opened a joint checking account in the Mutual National Bank of Chicago, which Benjamin and Anna used. On April 2, 1931, the Goodmans borrowed $1,400 from West Highland State Bank for which they gave a 90-day note. When a receiver was appointed for the bank on July 22, 1931, the balance due on the note was $1,057.79, plus interest. On February 24, 1932, judgment was entered in the Municipal Court of Chicago against the Goodmans for $1,228.52, the total *167 amount of their indebtedness to the bank, plus interest and attorney's fees. In the bank's claim against the Goodmans, it refused to allow set-off of the balance in their deposit account against their note. After the receiver for the bank was appointed, Benjamin and Anna Goodman conveyed the 81st & Loomis property to Anna's sister, Sara Faber, on September 26, 1931, the deed being recorded on October 8, 1931. Title to the Loomis Street apartment property remained in Sara Faber's name until March 13, 1942, when she conveyed the property to Benjamin Goodman. The deed was recorded on July 2, 1942. Sara Faber was a mere nominee, or "straw man"; she did not purchase the property. After the judgment against the Goodmans was entered, Benjamin gave a sworn statement, on March 30, 1932, in which he stated that his personal property consisted only of a small amount of furniture and necessary wearing apparel. On April 30, 1940, Benjamin gave the receiver a sworn statement that he was employed by Sara Faber as a caretaker of the Loomis Street property in return for an apartment which he and his family occupied without paying rent; that his gross earnings, represented by the value of the living *168 quarters, amounted to $600 per year; that he and his wife had no cash on hand or in banks, no life insurance, no real estate, and no other assets; that the value of their furniture and effects was $100; and that he had not previously owned any real estate which he had transferred. Anna executed a sworn statement on April 30, 1940, in which she stated that she owned no assets and had not made transfer of any real estate she owned. The sworn statements of Benjamin and Anna were false. However, the receiver for the bank did not ascertain the falsity of the statements and he accepted $200 in May 1940 from the Goodmans in full satisfaction of the judgment obtained by the bank for $1,228.52. From the time of the closing of the West Highland Bank in 1931 until 1945, the only known bank and postal savings accounts of members of the Goodman family were 3 postal savings accounts in the individual names of Oscar, Harold, and Benjamin, 2 joint savings accounts of Harold and Oscar, and a joint checking account of Harold and Oscar. Oscar's postal savings account, No. XXXX, was opened on December 30, 1935; the same kind of savings account of Harold, No. X8156, was opened on July 18, 1939; Benjamin's *169 account, No. XXXX, was opened on September 5, 1942. All of the postal savings accounts were at the Auburn Park Post Office in Chicago. All were in existence at the end of 1947. Harold and Oscar had a joint savings account, No. XX3631, at the Chicago City Bank & Trust Co. for a short time. It was opened on April 11, 1942, with a deposit of $139.60; no other deposit was made. It was closed by a withdrawal of $139.60 on July 21, 1945. On July 5, 1941, Harold and Oscar opened a joint savings account, No. X1293, in the Mutual National Bank of Chicago with a deposit of $115.46. It was maintained continuously and existed at the end of 1947. On March 10, 1942, Harold and Oscar opened a joint checking account in the Mutual National Bank with a deposit of $301.03. This account existed at the end of 1947. On March 30, 1945, Oscar executed an authorization permitting Anna to make withdrawals from his postal savings account. The joint checking account of Harold and Oscar at the Mutual National Bank was used by Anna and Benjamin for their banking and business purposes until September 30, 1947. They deposited checks in this account including checks received in payment of rents. Checks were *170 drawn on the account, which were signed by Oscar and given to Anna, to pay some of the expenses of properties owned by the Goodmans, and interest and payments on the principal of mortgages. During the years 1942-1947, inclusive, there were well over 700 withdrawals from this checking account. Funds were withdrawn from the postal savings accounts in the respective names of Oscar, Harold, and Benjamin at various times, which were used to make payments on mortgage loans After graduation from college in June 1940, Harold worked in accounting and commercial offices for 2 years. He was inducted into the Army on June 10, 1942, and was in military service until June 11, 1947, when he left active service, with an honorable discharge, and became a reserve officer in the United States Air Force. He served overseas in the European Theater of Operations from October 14, 1943, to June 7, 1947. At the end of 1942, the balance due on the Loomis Street property of the Goodmans was $22,500. At the end of 1943, the balance due on this indebtedness was $12,972.75, after principal payments in 1943 of $9,527.25, plus interest. The total amount of the interest and principal payments in 1943 was $10,556.56. *171 The balance due at the end of 1944 on the mortgage loan was $9,658.54, and on April 6, 1945, the balance was $9,057.73. On August 8, 1945, the Goodmans refinanced the mortgage on the Loomis property. They obtained a new mortgage loan of $22,000 through Draper and Kramer in Chicago. Of that sum, $9,268.39 was paid to New York Life which paid the balance due, plus a premium, on its mortgage loan; and the Goodmans retained roughly $12,731.60. In 1945, the Goodmans paid $672.76 on the principal of the new mortgage loan on the Loomis property, reducing it to $21,327.24. During 1945, the Goodmans purchased 2 apartment properties. One, 76th & Carpenter, containing 15 apartments, was purchased on April 1, 1945, for $46,500. The second, 82nd & Ada, containing 13 apartments, was purchased on August 8, 1945, for $43,735. In the latter part of 1946, the Goodmans started negotiations for the purchase of another property located at the corner of Ashland Avenue and 69th Street, known as 69th & Ashland, containing 3 stores and offices. This property was purchased on December 23, 1946, for $47,473.40. The Federal Rent Control laws were in effect until December 31, 1947. In July 1947, the *172 Congress provided for the termination of all rent control to be effective at the end of 1947. After it became known that rent control laws would be terminated, Anna again looked for apartment buildings with the intention of making additional purchases. In August 1947, after Harold had returned home, Benjamin and Anna became interested in an apartment house property containing 20 apartments and 6 stores located at the corner of 83rd and Racine Streets, Chicago. This property was purchased for $111,000 on September 27, 1947. [1] The details are stated hereinafter. In September 1947, negotiations were undertaken to purchase a property containing 16 apartments located at 9106-10 South Laflin Street, Chicago, known as 91st and Laflin. This property was purchased on October 10, 1947, for the net price of $81,542.28. The details are stated hereinafter. In summation, the purchases of 5 properties during the years 1945-1947, inclusive, by Benjamin and Anna Goodman, or purchases of three of the properties by them and purchases of two of the properties by Harold, *173 provide the bases, in part, for some of the respondent's determinations in these cases. At the end of 1947, 6 properties were owned by the Goodmans, or by them and by Harold. The years of the purchases, the designations of the properties, and the type, are as follows: Year
Properties
Type
1925
81st & Loomis
12 apartments
1945
76th & Carpenter
15 apartments
1945
82nd & Ada
13 apartments
1946
69th & Ashland
3 stores & of-
fices
1947
83rd & Racine
6 stores & 20
apartments
1947
91st & Laflin
16 apartments
Understatement Of Income For 1946 and 1947 From Properties In the case of Benjamin and Anna Goodman, the respondent originally determined that in their joint returns for 1946 and 1947, they failed to report rents and, also, bonuses received as a prerequisite of renting apartments, and that excessive amounts of deductions had been taken. He increased their taxable income by $7,384.89 for 1946, and $10,521.64 for 1947, as follows: 1946
1947
Unreported net rents
$2,533.59
$ 2,646.19
Unreported bonus receipts
1,550.00
4,650.00
Excessive deductions
3,301.30
3,225.45
$7,384.89
$10,521.64
Although the *174 respondent has made claims for increases in the deficiencies for 1946 and 1947 based upon net worth statements of the net assets plus nondeductible expenditures of Benjamin and Anna, he introduced evidence in support of his original specific adjustments. The following findings are made with respect to the income reported by the Goodmans in their returns and the income which they failed to report: The Goodmans reported in their joint return for 1946, rents, depreciation and expenses of 2 apartment properties for which no addresses were stated and the only descriptions given were that one was a 13-apartment building and the other was a 15-apartment building. These properties were in fact, respectively, the 82nd & Ada property and the 76th & Carpenter property. No references were made in the return to the 12-apartment building at 81st & Loomis. In their joint return for 1947, the Goodmans reported rents, depreciation, and expenses of 3 properties for which no addresses were stated and the only descriptions given were that they were a 13-apartment building, a 15-apartment building, and a stores and offices building. These properties were in fact the 82nd & Ada building, the 76th *175 & Carpenter building, and the 69th & Ashland building, which had been purchased at the end of 1946. No references were made in the return to the 81st & Loomis property. [2]
The Goodmans did not report rents from the 81st & Loomis property in any income tax return for any year prior to the taxable year 1948. In their return for 1948, in Schedule B, they reported the rents received and the expenses of 4 properties, Loomis, Ada, Carpenter, and Ashland. Early in 1949, the Goodmans made a request of OPA for permission to increase rents and were told to produce supporting evidence and a copy of their 1948 income tax return. Harold prepared his parents' return for 1948 and reported therein the rents received from the Loomis property, and the expenses and depreciation. In the 1948 return, he charged each building with an expense for his father's services as janitor and general labors. In the Goodmans' return for 1946, gross rent from 2 buildings in the amount of $14,715 was reported, and the net profit reported, after depreciation, repairs, and expenses, was *176 $748.26. In Schedule C, profit from business, the nature of business was stated to be "decorating and general handyman", the total receipts from which were reported to be $1,662. Materials and supplies in the amount of $103.40 were reported as business expenses, and net profit was set forth in the amount of $1,559.60. The total adjusted gross income reported for 1946 was $2,307.86, and the reported income tax liability was $15. The Commissioner, in the statutory notice of deficiency, determined that Benjamin and Anna realized in 1946, taxable income from rents and bonus payments in the amount of $4,083.59, which they failed to report, and he increased reported net income by $3,301.30, which represented disallowances of deductions taken in the return, as has been shown above. Based upon the above additions to taxable income, the Commissioner determined a deficiency in income tax for 1946 in the amount of $1,616.94, to which he added 50 percent under section 293(b), 1939 Code, namely, $808.47. In the return for 1947 of Benjamin and Anna, it was stated that the taxpayers were self-employed. Adjusted gross income was reported in the amount of $3,381.07, from which deductions *177 were taken for contributions in the amount of $507.16, and for automobile license, sales taxes, and gasoline taxes in the amount of $120, leaving net income of $2,753.91. The reported income tax liability was $143.24. The adjusted gross income, as reported, consisted of net rental receipts in the amount of $1,317.36; bonuses for apartments, $2,000; and net receipts from a business, described as "real estate & handyman", of $63.71. With respect to the latter business, gross receipts of $800 were reported, from which were deducted $105.67, for material and supplies; $210, for telephone; $214.59, for gas and oil; $109.50, for depreciation; and $96.53, for automobile fuel and repairs; or total deductions of $736.29. The property for which depreciation of $109.50 was deducted was a 1947 Pontiac automobile, which was stated to have been purchased July 1, 1947, for $1,752.43. Net receipts from rents in the amount of $1,317.36 was computed and reported as follows: Gross rent receipts
$24,366.24
Less: Depreciation
$ 4,188.55
Repairs
3,255.57
Expenses
15,604.76
23,048.88
$ 1,317.36
The Commissioner, in the statutory deficiency notice determined as stated *178 above that Benjamin and Anna realized, in 1947, taxable income, which they failed to report, from rents and bonus payments in the total amount of $7,296.19, and he disallowed deductions in the amount of $3,225.45, thereby increasing net income by $10,521.64; he allowed deduction for contributions in the amount of $167.84. Based upon the above additions to taxable income, the Commissioner determined a deficiency in income tax for 1947 in the amount of $2,764.64, to which he added 50 percent under section 293(b), namely $1,382.32. Rent control was in effect during 1946 and 1947 which put a ceiling on the monthly amount which could be charged for unfurnished apartments. The Goodmans obtained from new tenants in 1946 and 1947 extra payments, called a bonus, over and above the legal monthly rent fixed under regulations. In several instances a bonus was charged as the condition of giving a lease. The Goodmans did not report in their 1946 return the receipt of any bonus payments, but in their 1947 return, as already has been mentioned above, they reported income in the amount of $2,000 from bonus payments which they described simply as, "Bonuses for Apartments," without reference to any *179 particular apartment house. The respondent's agents found that two tenants paid bonuses in 1946 in order to obtain apartments in the 82nd & Ada house, and that several tenants paid bonuses in 1947 in order to obtain apartments in the 81st & Loomis house and the 76th & Carpenter building, and that the net amount of the bonuses received in 1947 exceeded $2,000. In some instances, the apartments were furnished with inexpensive furniture and a prospective tenant was told that an apartment could be obtained only by taking the furniture, the charge for which was included in the total amount of the bonus payment which was asked. The apartments contained 4 or 5 rooms, including the kitchen. A value of $400 or $500 was placed on the furniture by the Goodmans. The practice followed by the Goodmans in charging a bonus for an apartment was as follows: They required in every instance that the bonus should be paid in cash, and they specified that a receipt could not be given for the entire amount of the bonus. However, they gave a receipt for a lesser amount, namely, the value which they placed upon the furniture which they sold to the tenant as part of the arrangement. Such receipts were informal, *180 handwritten lists of the furniture in the apartment and indicated that the furniture was sold for $400, or whatever the "price" might be. The cash bonuses were paid to a member of the Goodman family, usually to Anna. Some payments were made to either Oscar or Harold, and some were made to Anna in Harold's presence. In some instances the receipt for the "purchase" of furniture was signed by Harold. In some cases a bonus was obtained for an unfurnished apartment; in other instances no value is shown to have been put on furniture which was in an apartment. During 1946, the Goodmans received cash payments totalling $2,050 as bonuses for 2 apartments which were rented in the 82nd & Ada building, in addition to the regular rents. Mrs. Howard Broderson paid a bonus of $50 to Anna in order to obtain an unfurnished apartment. Albert Kelso paid $2,000 for the lease of a 5-room apartment in which furniture was placed for which $500 was charged as the selling price of the furniture, so that the bonus over and above furniture was $1,500. The entire amount was paid to Oscar Goodman who gave Kelso a receipt for $500. In determining the original deficiency of Benjamin and Anna for 1946, the respondent *181 properly added to their income the net amount of $1,550 as unreported income from bonuses. During 1947, the Goodmans received cash bonuses totalling $8,950 of which $3,000 was paid by 2 tenants who obtained apartments in the 76th & Carpenter building, and $5,950 was paid by 5 tenants who obtained apartments in the 81st & Loomis house. In 3 cases a value of $400, each, was placed by the Goodmans on furniture "sold" to the tenants, or $1,200. Allowing an additional $1,100 for furniture "sold" to tenants in 1947, or a total sum of $2,300, the net amount of bonus payments received in 1947 was $6,650, of which the Goodmans reported in their return only $2,000. They failed to report bonus income received in the amount of at least $4,650, as the respondent determined. One of the tenants at 81st & Loomis, James T. Mulligan, who paid the Goodmans a cash bonus in 1947 of $1,900, filed suit against the Goodmans on December 22, 1947, on account of the bonus payment for treble damages in the amount of $5,700 for violation of OPA. The claim was settled in 1948, upon the payment of $1,000 by the Goodmans. The Goodmans failed to report in their returns net rents which they received from the *182 81st & Loomis apartments in the amounts of at least $2,533.59 in 1946, and $2,646.19 in 1947, as the respondent determined. With respect to deductions taken in the returns for the taxable years, the respondent now concedes that his determinations whereby he disallowed deductions for 1946 and 1947 as excessive in the amounts of $3,301.30 and $3,225.45, respectively, were partially erroneous, and that the Goodmans are entitled to additional deductions for 1946 and 1947 in the amounts of $2,132.06 and $2,119.95, respectively. The petitioners no longer contest the determinations that they overstated deductions in the net amounts of $1,169.24 for 1946, and $1,105.50 for 1947. The details supporting the above figures are as follows: Property
Allowable
Excessive
Involved
Deductions
Deductions
1946
82nd & Ada
$ 552.27
$1,121.75
Carpenter
1,579.79
47.49
$2,132.06
$1,169.24
1947
82nd & Ada
$1,683.08
$ 700.00
Carpenter
436.87
405.50
$2,119.95
$1,105.50
In summation, the petitioners failed to report income from their properties in the amounts of at least $5,252.83 for 1946, and $8,401.69 for 1947, as follows: Unreported Income
1946
1947
Unreported rents, Loomis
St.
$2,533.59
$2,646.19
Unreported bonuses
1,550.00
4,650.00
Excessive deductions
1,169.24
1,105.50
$5,252.83
$8,401.69
*183 On charges that he understated his taxable income for 1946 and 1947 by failing to report rents and bonuses and taking excessive deductions, Benjamin was indicted and tried for income tax evasion on February 2, 1955, in the United States District Court for the Northern District of Illinois. He was acquitted. Respondent's Determination of Net Worth The respondent's agents made investigations to determine the net worth of the Goodmans in 1945, 1946, and 1947, in the course of which they investigated earlier years. The respondent redetermined the Goodmans' income for the taxable years 1946 and 1947 based on the net worth plus nondeductible expenditures method and made claims at the time of the trial for increases in the deficiencies, thereby changing the basis of his determinations from the basis of making specific adjustments in their income tax returns, which was the method used in the original determinations of the deficiencies in the Goodmans' case. Prior to and at the trial the parties did not enter into stipulations of facts about the items of assets, liabilities, and nondeductible expenditures of the Goodmans at the time of the opening of the net worth analysis and during *184 and at the end of 1946 and 1947, other than a stipulation about the facts pertaining to loans on insurance policies on the lives of Benjamin, Harold, Oscar, and Ernest, obtained by Benjamin during the years 1930-1945 and repayments during the years 1933-1946; a few other items were stipulated orally at the trial. Lacking a general stipulation of all of the facts involved in respondent's net worth analysis, the respondent presented proofs to establish all of the dollar amounts and items in his net worth statement. At the conclusion of the trial, the respondent introduced a revised net worth statement to conform to the proof and filed his second amended answer alleging that the net taxable income of the Goodmans for 1946 and 1947 was $62,447.77 and $29,45.18, respectively, which amounts are larger than were claimed in respondent's first amended answer in which he alleged that their net income was $60,023.15 in 1946, and $21,765.64 in 1947. Reference has been made hereinbefore to the 8 insurance policies on the lives of Benjamin, Harold, Oscar, and Ernest. The stipulation of facts about the amounts and dates of the loans obtained on these policies and the amounts and dates of the repayments *185 of the loans is incorporated herein by this reference. The face amounts of the policies were from $1,000 to $3,000; the amounts of the individual loans ranged from around $130 to $690, except one for $1,000. In both his original and revised net worth statements, the respondent did not include any amount in the opening net worth as of December 31, 1945, for accumulated and undeposited cash; and he did not include any amount for undeposited cash on hand as of December 31, 1946 and 1947. He did not regard any bank accounts or postal savings accounts in the names of Harold and Oscar, or any other son, as a bank account of the Goodmans. He allowed only $10 as the cash on hand at the end of 1945, that being the balance then in Benjamin's postal savings account XXXX, which he had opened on September 5, 1942. The Goodmans owned at least the assets, exclusive of claimed, accumulated, undeposited cash and other claimed assets, and they had the liabilities, at the end of 1945 (the opening of the net worth), 1946, and 1947 in the amounts shown in the respondent's revised net worth statement. [3]
*186 The Goodmans were entitled to the depreciation allowances shown in the following net worth statement for the taxable years, and for an additional contributions allowance in 1947 of $367.84, and for the standard deduction of $500 in 1946. They received an income tax refund of $209.78 in 1946. They received at least $14,552.98 from Harold in 1946, and $4,665.35 in 1947, which were nontaxable receipts, which are explained hereinafter. The Goodmans paid 1946 income tax in 1947 in the amount of $65, a nondeductible expense. Their nondeductible living expenses were not more than $3,000 in each of the years 1946 and 1947. The Goodmans made a nondeductible disbursement of $4,000 in 1946 to Oscar, and they made nondeductible disbursements in 1947 to Harold in the amount of $4,863.33 and other aggregating $18,500, which are explained hereinafter, and are also set forth in a schedule following the net worth statement. The respondent's revised net worth statement for the Goodmans is as follows; the Goodmans had, at least, the assets and liabilities shown therein. Based upon this revised net worth statement, the respondent has made the affirmative allegation that the Goodmans' corrected net *187 income and unreported income were in the amounts produced by his net worth analysis: Benjamin and Anna Goodman
Revised Statement of Net Worth
ASSETS:
12-31-45
12-31-46
12-31-47
Cash in Bank: The Mutual National Bank: Savings Account #XX3103
0
$ 9,537.51
$ 8.09
Checking Account
0
0
203.06
Postal Savings Account #XXXX
$ 10.00
1,730.00
2,500.00
U.S. Government Bonds
1,500.00
1,500.00
1,500.00
ASSETS
12-31-45
12-31-46
12-31-47
Real Estate: 81st & Loomis
76,500.00
76,500.00
76,500.00
76th & Carpenter
46,500.00
46,500.00
46,500.00
82nd & Ada
43,735.00
43,735.00
43,735.00
69th & Ashland
0
47,473.40
47,473.40
Total Assets
$168,245.00
$226,975.91
$218,419.55
LIABILITIES: Mortgages Payable: 81st & Loomis
$ 21,327.24
$ 16,713.30
$ 13,501.65
76th & Carpenter
28,600.00
20,500.00
0
82nd & Ada
24,413.69
19,595.15
18,252.94
Note Payable: The Mutual National Bank
1,000.00
0
0
Total Liabilities
$ 75,340.93
$ 56,808.45
$ 31,754.59
Net Worth
$ 92,904.07
$170,167.46
$186,664.96
Prior Year's Net Worth
92,904.07
170,167.46
Net Worth Increase
$ 77,263.39
$ 16,497.50
Less: Depreciation
4,245.00
5,688.55
Received from Harold
14,552.98
4,665.35
Income Tax Refund
209.78
0
Additional Contributions Allowed
0
367.84
Standard Deduction
500.00
0
Total
$ 19,507.76
$ 10,721.74
$ 57,755.63
$ 5,775.76
Add: Living Expenses
$ 3,000.00
$ 3,000.00
Income Taxes Paid
0
65.00
Disbursed to Harold
0
23,363.33 *
Disbursed to Oscar
4,000.00
0
Total
$ 7,000.00
$ 26,428.33
Corrected Net Income
$ 64,755.63
$ 32,204.09
Net Income Reported
2,307.86
2,753.91
Unreported Income
$ 62,447.77
$ 29,450.18
*188 Harold sent money home to his parents consisting of Class E allotments of $90 per month, transmittals through the personal transfer account system, and endorsed checks of servicemen, payable to them, which he obtained through his own devices. In his revised net worth statement, the respondent treated these transmittals as nontaxable receipts of the Goodmans, and he determined that such receipts amounted to $14,552.98 in 1946, and $4,665.35 in 1947, as shown below. The petitioners do not agree to the amounts as allocated to each year by the respondent: Items
1946
1947
Class E Allotments, 12 mos.
at $90
$ 1,080.00
Class E Allotments, 6 mos.
at $90
$ 540.00
P.T.A.
1,840.00
440.00
Servicemen's checks and
drafts: Lemcke's cashiers checks
8,037.51
Lemcke's cashiers check
1,500.00
Harry Peters
685.55
Robert E. Lee
1,409.92
Roy Counts
1,906.33
Arnold Smart
600.00
Bert Klein
200.00
Bert Klein
100.00
Albert Jones
729.02
L. H. McCormack
150.00
$14,552.98
$4,665.35
There were withdrawals in 1947 from a joint savings account in the Mutual Bank in the name *189 of Benjamin and Anna, opened on December 30, 1946, totaling $18,500, which were used in the purchases of 83rd & Racine and 91st & Laflin, and as a deposit in a commodity trading account with Daniel F. Rice and Company in the name of Harold. The respondent, in his final net worth statement, treated them as disbursements to Harold and as nondeductible expenditures of the Goodmans, as shown in respondent's revised net worth statements. They were as follows: Dates of With-
drawals
Amounts
Sept. 6, 1947
$ 2,000
Sept. 17, 1947
10,000
Sept. 17, 1947
6,500
$18,500
Cashiers checks were purchased with the withdrawn cash; the checks were applied as follows: Sept. 6, 1947, $2,000 applied to the purchase of 91st & Laflin; Sept. 17, 1947, $6,500 applied to the purchase of the Laflin property; Sept. 17, 1947, $5,000 applied to the purchase of the Racine property; and Sept. 17, 1947, $5,000 deposited in the Daniel Rice Company account in Harold's name. 1945: Expenditures To Acquire Assets And Reduce Debts The Goodmans bought the 76th & Carpenter apartment building on April 1, 1945, for $46,500, of which $30,000 was borrowed from Chicago Title and Trust Co. at 4 1/2 percent *190 interest, secured by a mortgage, and $7,000 was borrowed on a note from the Mutual Bank. The closing costs were paid in cash, $732.47. Therefore, the cash expended was $10,232.47. There were available to the Goodmans for the cash required, balances in the postal savings accounts in the names of Benjamin, Harold, and Oscar, individually, and in the joint savings account X1293 of Harold and Oscar in the Mutual Bank, and in the joint checking account of Harold and Oscar in the Mutual Bank. In fact, there were withdrawals from all of those accounts in excess of $10,232.47 at about the time of the purchase of the Carpenter property, the use of which is now shown, however, as follows: 4/ 2/45
Oscar, P. Svgs.
$ 2,495.00
4/ 2/45
Harold, P. Svgs.
1,010.00
4/ 2/45
Benj., P. Svgs.
1,490.00
3/31/45
Jt. Chkg. H. & O.
2,638.15
4/ 2/45
Jt. Chkg. H. & O.
3,571.00
4/17/45
Jt. Svgs. H. & O.
1,800.00
$13,004.15
During 1945, the Goodmans paid $6,000 on the amount owed to the Mutual Bank; $1,400 on the mortgage on the Carpenter property; $586.31 on the 82nd & Ada property mortgage (which property was also purchased in 1945); and $672.76 on the Loomis property *191 mortgage. These payments on indebtedness in 1945 totaled $8,659.07. The Goodmans purchased the apartment property at 82nd & Ada on August 8, 1945, for $43,735. They obtained a mortgage loan of $25,000. As stated hereinbefore, the Goodmans refinanced and obtained a new mortgage loan of $22,000 on the Loomis property, also on August 8, 1945, of which they retained in cash the net amount of $12,731.61, after paying the balance due and a premium on the old Loomis mortgage. They applied such borrowed funds to the purchase of 82nd & Ada. Accordingly, borrowed funds in the total amount of $37,731.61 were used in purchasing the Ada property, leaving $6,003.39 to be paid in cash, plus closing charges of $88.40, or $6,091.79, in cash. There was available to the Goodmans at this time, a balance in the joint checking account of Harold and Oscar in the Mutual Bank. On July 13, 1945, $3,200 was drawn from that account, the use of which is not shown, however. The Goodmans used cash in the purchase of the Ada property which they had on hand and was not deposited in any bank account. During 1945, therefore, the Goodmans made cash expenditures, apart from borrowed funds, in the total amount *192 of $24,983.33, as follows: In the purchase of Carpenter
$10,232.47
In the purchase of Ada
6,091.79
Payments on loan and mtgs
8,659.07
$24,983.33
Goodman Family Bank Accounts 12/31/45 The Goodmans freely used bank and postal savings accounts in the names of their sons, Harold and Oscar. Harold was overseas during the period October 14, 1943 to June 7, 1947; Oscar was in or near Chicago. At the end of 1945, there were in existence the following 3 postal savings accounts and 2 joint bank accounts from which Benjamin and Anna were free to make withdrawals: Dates
Type & Lo-
In Name of
Opened
cation
Number
Oscar
12/30/35
Postal Svgs.sh5923
Harold
7/18/39
Postal Svgs.
X8156
Benjamin
9/ 5/42
Postal Svgs.
XXXX
H. & O.
7/ 5/41
Mutual Svgs.
X1239
H. & O.
3/10/42
Mutual Chkg.
The deposits, withdrawals, and year-end balances in the 3 postal savings accounts through 1947 were as follows: Oscar's Account
Total
Total
Annual
Annual
With-
Year-End
Year
Deposits
drawals
Balances
1935
$ 15
$ 0
$ 15
1936
2
12
5
1939
603
1
607
1942
900
0
1,507
1943
940
1,502
945
1944
1,555
0
2,500
1945
0
2,495
5
1946
0
0
5
1947
2,160
0
2,165
Harold's Account
1939
$ 506
$ 0
$ 506
1942
510
0
1,016
1943
0
1,015
1
1944
1,015
0
1,016
1945
0
1,010
6
1946
2,030
0
2,036
1947
464
0
2,500
Benjamin's Account
1942
$2,500
$ 0
$2,500
1943
2,031
2,500
2,031
1944
469
0
2,500
1945
0
2,490
10
1946
1,720
0
1,730
1947
770
0
2,500
*193 The deposits, withdrawals, and balances in joint savings account X1293 in the names of Harold and Oscar in the Mutual Bank through 1947 were as follows: Total
Total
Year-End
Year
Deposits
Withdrawals
Balances
1941
$ 402.29
$ 165.00
$ 237.29
1942
444.48
370.00
311.77
1943
139.87
0
451.64
1944
937.40
0
1,389.04
1945
559.45
1,800.00
148.49
1946
946.84
0
1,095.33
1947
5,044.61
6,000.00
139.94
The deposits, withdrawals, and balances in the joint checking account in the names of Harold and Oscar in the Mutual Bank in the years 1942-1947 were as follows: Total
Annual
Total Annual
Year-End
Year
Deposits
Withdrawals
Balances
1942
$ 4,622.74
$ 2,664.02
$1,958.72
1943
8,350.73
9,130.53
1,178.92
1944
7,469.94
7,824.23
824.63
1945
22,943.28
23,399.13
368.78
1946
19,592.28
17,445.53
2,515.53
1947
24,787.99
26,727.78
572.74
Oscar opened his own, individual checking account in the State Bank in Evanston, Illinois on January 13, 1945, with a deposit of $298.35. The total deposits and withdrawals and the balances in this checking account during 1945, and up to November 24, 1947, when *194 the account was closed out, were as follows: Total
Total
Year-End
Year
Deposits
Withdrawals
Balances
1945
$3,506.15
$2,158.17
$1,347.98
1946
4,251.60
5,441.58
158.00
1947
10.00
168.00
0
1946: Expenditures to Acquire Assets and Reduce Debts During 1946, the Goodmans made the following payments on their bank and mortgage indebtedness; they paid the balance due on the debt owing to the Mutual Bank, $1,000; and $4,613.94 on the Loomis mortgage, $8,100 on the Carpenter mortgage, $4,818.54 on the Ada mortgage. These payments totaled $18,532.48. During 1946, they purchased for cash the property at 69th & Ashland (offices and 3 stores) at the price of $47,473.40. The purchase was closed on December 23, 1946. Anna negotiated and handled the purchase. The 69th & Ashland property was acquired in the name of Anna's sister, Sara Faber, to whom a receipt was given for the payment of $42,473.40, and in whose name the deed to the property was made on December 17, 1946, which was recorded on December 26, 1946. However, on November 6, 1946, when Anna made the down payment on the property, Sara executed a quit claim deed to the property to Benjamin Goodman. *195 Title to the 69th & Ashland property was held in Sara's name during the remainder of her life. Her deed to Benjamin was recorded by him on July 1, 1947, after Sara's death on June 26, 1947. In paying for the Ashland property, Anna cashed and used 2 checks (included in a list above) of servicemen which she had received in 1946 from Harold, namely, the following: A check dated November 6, 1946, drawn on the branch of the Bank of America at Stockton, California, payable to and endorsed by Robert E Lee, in the amount of $1,409.92. A check dated October 17, 1946 drawn on the Continental Bank and Trust Company of Salt Lake City, payable to and endorsed by Harry G. Peters, in the amount of $685.55. The total of the 2 checks is $2,095.47. At the time they endorsed the checks, Lee and Peters were in the Air Force and were stationed in Fuerstenfeldbruck, Germany, near Munich. Harold received their checks in his finance office in the course of his duties as a finance officer. The amounts of these checks did not represent taxable income of the Goodmans. On June 16, 1946, Anna purchased a cashiers check in the amount of $4,000 from the Mutual National Bank which was made payable to Oscar Goodman. *196 It represented a nondeductible cash disbursement of Anna. The expenditures of the Goodmans during 1946 stated above, exclusive of $2,095.47 received through Harold, totaled $67,910.41 as follows: Payments on Ashland property
$45,377.93
Payments on indebtedness
18,532.48
Payment for check to Oscar
4,000.00
$67,910.41
On December 20, 1946, Benjamin and Anna opened in the Mutual Bank joint savings account XX3103. At the end of 1946, the balance in this account was $9,537.51, which represented 2 deposits in the account in the amounts of $8,037.51 and $1,500. These deposits were 2 checks which Anna received from Harold in 1946 (shown in a list above). The checks had been turned into Harold's finance office in Germany by a serviceman stationed in that area, H. K. Lemcke. One check, in the amount of $8,037.51, dated September 28, 1946, was made payable to and endorsed by H. K. Lemcke; the other in the amount of $1,500, dated October 15, 1946, was made payable to and endorsed by his wife, Florence L. Lemcke. Both checks were drawn on The Bank of California in Tacoma, Washington. H. K. Lemcke is Hans K. Lemcke. During 1946, deposits were made in postal savings *197 account XXXXin the name of Benjamin in the total amount of $1,720. There were no withdrawals. At the end of 1946, the balance in this account was $1,730. 1947: Expenditures and Other Items During 1947, the Goodmans made payments on mortgage indebtedness in the total amount of $25,053.86, as follows: Loomis mortgage
$ 3,211.65
Carpenter mortgage
20,500.00
Ada mortgage
1,342.21
$25,053.86 They paid the entire balance due on the Carpenter mortgage. On March 8, 1947, there was a deposit in joint savings account XX3103 in the Mutual Bank in the name of Anna and Benjamin in the amount of $729.02. The deposit was a check in that amount, drawn on the Chelsea Savings Bank in Chelsea, Massachusetts, made payable to and endorsed by Albert Jones, which had been deposited in due course in Harold's finance office in Germany, and thereafter diverted by Harold who sent the check to Anna. There were deposits in and withdrawals from this savings account, XX3103, during 1947 (referred to hereinafter). The total amount of the deposits was $8,970.58, which increased the balance to $18,508.09; the total amount of the withdrawals was $18,500; and the balance at the end of *198 1947 was $8.09. During 1947, $770 was deposited in Benjamin's postal savings account XXXX, and the balance at the end of 1947 was $2,500. On January 15, 1947, Anna Goodman opened a savings account, XX2226, in her name only, in the Chicago City Bank & Trust Co., where Harold and Oscar formerly had a joint savings account which was closed on July 21, 1945. The initial deposit in this savings account was $2,036.33. There were deposits made in this account up to and including August 25, 1947. The savings account was closed on September 30, 1947. Between January 15, 1947 and September 30, 1947, the deposits in the account totaled $9,863.33. On August 25, 1947, there was a withdrawal of $5,000, and on September 30, 1947 a withdrawal of $4,863.33 closed the account. This savings account is referred to hereinafter. On September 30, 1947, Benjamin and Anna opened a joint checking account in the Mutual Bank with a deposit of $310. This was the first, known checking account in their names, or the name of either, since their joint checking account in the West Highland State Bank which was closed in 1931. The deposits in this checking account during 1947 totaled about $7,917.12, and the withdrawals *199 totaled about $7,714.06. The balance in this account on December 31, 1947 was $203.06. The first Federal income tax return which was filed by Benjamin and Anna was a joint return for the taxable year 1942, and under this return income tax in the amount of $39 was paid. They filed separate returns for 1943; Benjamin paid tax in the amount of $117.56, and Anna paid tax of $181.62. Benjamin filed a separate return for 1944 and paid tax in the amount of $98.51. Anna filed a separate return for 1944 under which she claimed overpayment of $2.20, which was refunded. They filed a joint return for 1945 under which they claimed overpayment of $209.78, which was refunded in 1946, with interest of $1.76, which made the total refund $211.54. Sara Faber Sara Faber, Anna's sister, filed Federal income tax returns for 1920, 1921, 1922, and 1923, and paid income tax for those years in the amounts of $8.94, $6.30, $9.61, and $1.68, respectively. She did not file returns for the years 1924-1934, inclusive, and she filed returns reporting no tax due for the years 1935-1942, inclusive. She did not file a return for 1943. She filed a return for 1944 and paid tax of $31.80. She filed returns for 1945 *200 and 1946 in which she claimed overpayments and received refunds of $23.40, and $23.30, respectively. She died in 1947, and for that year her executrix, Anna Goodman, filed her return in which overpayment was claimed, and refund was made, of $70.30. Sara was employed by Rothmoor Company as a tailor from 1938 through 1946. The record does not show what other employment she may have had in other years. A special agent in the Intelligence Division of the Internal Revenue Service in Chicago examined the records of Rothmoor Company to ascertain Sara's earnings and found that beginning in 1938 her earnings never exceeded $1,500 per year except for 1946, when her earnings were about $2,200. On February 6, 1940, Sara opened a savings account in the First National Bank of Chicago. The initial deposit in this bank account was $2,745.04, which was deposited on February 7, 1940. The special agent referred to above ascertained during his investigation that Sara had owned real estate at 2037 West Cortez Street, Chicago. Sara's address was 2037 West Cortez Street. The special agent ascertained that Sara sold property on West Cortez Street on February 6, or 7, 1940, for $7,950, including a mortgage *201 of about $5,000, and that the purchaser paid Sara the net amount of about $2,900. During the years 1940-1946, inclusive, and until June 26, 1947, when Sara died, the usual deposits in Sara's bank account were in amounts from about $8 up to $159.12. There were only 2 deposits in larger amounts; on April 1, 1944, there was a deposit of $645.10, and on June 1, 1946, there was a deposit of $1,000. The withdrawals from the account were usually in amounts less than $100; the only larger withdrawals were $600 on February 10, 1940; $750 on March 12, 1943; $300 on March 12, 1943; and $1,000 on January 4, 1947. The balance in the account at the time of Sara's death was $3,323.42. Credits of interest to the account after June 26, 1947, increased the balance to $3,364.88. Anna Goodman was appointed executrix of Sara's estate. In that capacity, Anna filed a sworn "Application For Inheritance Tax Consents" with the Attorney General and State Treasurer of the State of Illinois in February 1948, in which she stated that the only heirs at law were herself and Hennie Faber, a niece; that the decedent in her last will and testament bequeathed to Anna Goodman funds in the amount of $3,364.88, which *202 consisted of cash in bank; that the decedent did not own any real estate at the time of her death; and that the decedent did not make any gifts or transfers of money or property, real or personal, or any interests therein "during life and while sick or injured." On March 16, 1948, the bank account in the name of Sara Faber in The First National Bank was changed to the name of Anna Goodman, Executrix. On that date the balance in the Sara Faber account was $3,364.88. The new account in Anna's name was opened with a credit of $3,253.76. In the new account there were credits in 1948 and 1949 for interest totaling $29.49, and there were withdrawals in 1949 totaling $1,806.84. There was a balance on April 28, 1949 in the amount of $1,476.41, which amount was withdrawn on April 28, 1949.
Oscar Goodman Oscar graduated, with the B.S. degree in Business Administration, from Northwestern University in June 1943. Upon graduation, he obtained a position with Alden's Chicago Mail Order Company in Chicago where he worked during 1944 and 1945. During 1946, he worked for Spiegel, Inc., in Chicago. In the latter part of 1946, and during 1947, he was employed by the University of Wisconsin, in *203 Madison, Wisconsin. During the years 1947-1952, Oscar taught economics in the School of Commerce and he studied at the University of Wisconsin in preparation for the doctor's degree. He received the Ph.D. degree in 1952. Oscar lived in Evanston from January to June 1943, and with his parents during the rest of 1943. Except for the summer months when he lived with his parents, he lived in Evanston during 1944, and also from January to June 1945. He lived with his parents during the second half of 1945 and the first half of 1946. He lived in Madison, Wisconsin, from October to the end of 1946, and during 1947, except for week-end visits to see his parents. Oscar's gross income for 1943 was $1,139.23. He received from Alden's Chicago Mail Order Company $2,842.10 in 1944, and $2,430 in 1945. He received wages from Spiegel, Inc., of $2,737.25 in 1946. During 1947, he received from the University of Wisconsin $2,186.03, and he reported taxable net income of $1,807.03, after deducting a net loss of $379. A commodities trading account with Daniel F. Rice and Company in Chicago was opened in Oscar's name on September 26, 1947, which is referred to hereinafter. Oscar reported in his 1947 *204 return profit from this account in the net amount of $3,135, short-term capital gain. Harold Goodman In the case of Harold, the respondent made a net worth analysis in the first instance which produced $120,407.16 as the 1947 increase in net worth, plus nondeductible expenditures, minus certain adjustments. No facts were stipulated. Respondent introduced proofs in support of his net worth analysis, under his burden of proof with respect to his determination of a 50 percent addition to the deficiency as a fraud penalty under section 293(b). At the conclusion of the trial, the respondent introduced a revised net worth statement with certain adjustments showing increase in net worth in 1947, plus nondeductible expenditures, in the amount of $87,603.43 and, on this basis, unreported income of $86,715.34, and, therefore, an income tax deficiency in the lower amount than originally determined. The respondent did not include in assets at the opening of the net worth statement any amount for cash accumulated before 1947 and on hand at the end of 1946 as undeposited cash, or any amount for cash on hand, undeposited, at the end of 1947. Part of the statement are 2 schedules which are *205 the same as schedules made part of the revised net worth statement of the Goodmans explaining Harold's disbursements to his parents in 1947 totaling $4,665.35 (included herein supra), and disbursements of the Goodmans to Harold in 1947 totaling $18,500 (referred to hereinbefore). In 1947, Harold received Army pay and allowances of $2,456.89 in 1947, which are tax exempt and have been excluded from taxable income by the respondent. The respondent's revised net worth statement includes items which are in dispute. His net worth statement is as follows: HAROLD GOODMAN
Revised Statement of Net Worth
ASSETS
12/31/46
12/31/47
Cash on Hand
$1,886.90 $0
Cash in Bank: Mutual Savings X1293
1,095.33
139.94
Mutual Checking
2,515.53
572.74
Standard Checking
0
996.46
Postal Savings
2,036.00
2,500.00
U.S. Savings Bonds
1,912.50
2,250.00
Pontiac Car
0
1,752.43
Brokerage Accounts: Daniel F. Rice Co.
0
14,641.25
Daniel F. Rice Co. n/o
Oscar
0
17,795.74
Real Estate: 83rd & Racine
0
111,000.00
91st & Laflin
0
82,500.00
Total Assets
$9,446.26
$234,148.56
LIABILITIES
83rd & Racine
80,000.00
91st & Laflin
34,646.34
Total Liabilities
$114,646.34
Net Worth
$9,446.26
$119,502.22
Prior Year's Net Worth
9,446.26
Increase in Net Worth
$110,055.96
Add: Disbursed to B. & A.
Goodman
4,665.35
$114,721.31
Less: Depreciation
$ 1,297.66
Army Pay & Allowances
2,456.89
Received from B. & A.
Goodman
4,863.33
Received from B. & A.
Goodman
18,500.00
$ 27,117.88
Corrected Net Income
$ 87,603.43
Less Net Income Re-
ported
888.09
Unreported Net Income
$ 86,715.34
*206 As stated hereinbefore, Harold went into the Army on June 10, 1942; he served overseas in England, France, and Germany from October 14, 1943, until June 7, 1947; he received an honorable discharge on June 11, 1947. Harold attended Officers' Candidate School at Duke University and received the commission of Second Lieutenant on April 28, 1943. He was ordered to report to the overseas replacement depot at Fort Benjamin Harrison, Indiana. Before reporting, Harold visited Chicago in May 1943. From Fort Benjamin Harrison, he was assigned to Kelly Field, Texas, where he received his overseas orders. When Harold received his overseas orders at Kelly Field, Texas, he knew he was going to England by the markings he was required to place on his foot locker and the fact that he had to turn in his summer clothing. Harold was appointed an assistant finance officer on about April 28, 1943. He departed from Boston for overseas duty on October 14, 1943, and was stationed in Stone, England, where he served as an assistant finance officer. While in England, he was appointed finance officer, on April 17, 1944. Thereafter, his position was finance officer until February 28, 1947, when he was relieved *207 of that assignment in a routine changeover because he was preparing to return to the United States. Harold was stationed in Stone, England, until the spring of 1945. While there, he applied for service in Russia but he did not receive such assignment. He was promoted to the rank of First Lieutenant on February 16, 1945. He received a transfer to Le Bourget, France, in the spring of 1945 and was there until October 1945, when he was transferred to the Air Force base at Fuerstenfeldbruck, near Munich, Germany. There he was in complete charge of the finance office, as a Class B finance officer responsible to a superior finance officer at Obenpfaffenhofer, 20 miles away. Sometime in 1946, he became a disbursing finance officer with an account number and symbol and his routines then included sending reports to and working directly with the United States Treasury. The Treasury would charge certain sums to the account of Harold's office and he was required to render a monthly account of his collections and disbursements. In his monthly accounting, before military scrip came into use on September 13, 1946, he was not required to make any segregation between allied military marks and native *208 German marks. After military scrip came into use, he was not required to make any segregation between military scrip and United States currency because both categories were considered, or accounted for, as United States currency. Harold was promoted to the rank of Captain on April 2, 1946. The accounts in the finance office of which Harold was in charge were subject to unannounced inspections at irregular intervals. His accounts received such inspections in January and July 1946, and both inspectors reported that Harold was operating "a model finance office" and should be commended on his organization. He received commendation of the Commanding General, United States Air Forces in Europe on July 16, 1946, on the basis of a recommendation by a headquarters inspector who reported that, "The system of internal control maintained by Captain Goodman, the accuracy of his accounts and records, the efficiency with which personnel of his office are performing their respective duties are superior and reflect credit upon himself and his personnel." During the years material here, and in general during World War II, departments of the United States Government, Treasury, War, Navy, and State, *209 adopted many policies relating to the computation of the pay of military personnel assigned to duty in overseas areas, the types of currency to be used in overseas areas, the matter of allowing conversions of American dollars into foreign currencies and reconverting foreign currencies into American dollars, the matter of taking American dollars into overseas areas, the control of all currency transactions, and provisions for transmitting funds from the United States to military personnel in overseas areas, and for the transmission of funds by personnel in overseas areas to persons or banks in the United States. Such policies were carried out under military regulations and directives which were modified or changed from time to time. There were official rates of exchange for all allied currencies and regulations relating thereto. In the military finance offices, military personnel could and did maintain soldiers' savings accounts and received 4 percent interest on deposits. It was not uncommon for personnel serving in the European Theatre during the years material here to arrange for the receipt of rather large amounts of funds, transmitted by checks drawn on banks in the United States, *210 under regulations. Service personnel could either deposit such checks in a military savings account or exchange the checks for the authorized type of currency used in the area where stationed at the official rate of exchange, i.e., cash checks at the official rate for the authorized local currency or type of currency. In the military finance offices, also, there were facilities for transmitting funds to persons in the United States known as personal transfer accounts, P.T.A. Such transfers were handled by base finance officers who sent lists of remitters to a finance officer in the United States, who, in turn, would draw United States Treasury checks in the amounts being transferred to the designated payees. A base finance officer's account with the Treasury would be charged with amounts paid in the United States to the designated payees under this system. Service personnel also could send funds to the United States by postal money orders through a postal officer under the Post Office Department. Early in the war, a decision was made to use foreign currencies in military operations abroad, which included the payment of military personnel and troops in foreign currencies. That policy *211 included provisions for the reconversion of foreign currencies into dollars, and the conversion of dollars into foreign currencies, both at official rates of exchange. When Harold arrived at Le Bourget in the spring of 1945, the policy of using the foreign currency of the area was still in effect and exchanges were being made of American dollars for all of the allied currencies and of such local currrencies for dollars. At Le Bourget, it was part of Harold's duties as a finance officer to make such exchanges. From time to time, it became necessary to adopt various kinds of currency control regulations in the European Theatre and elsewhere. Such controls included media of exchange and particular types of military currency. There were special problems in Germany as well as in other theatres of operations. One of the forms of currency control which was adopted was the Currency Exchange Control Book, usually referred to as currency control books. This plan was adopted in the European Theatre in October 1945 for all military personnel, effective November 10, 1945. Another type of control adopted subsequently, in 1946, was the use of military payment certificates, popularly called *212 military scrip, printed in various denominations. Under Circular 139, dated October 10, 1945, currency control books were first issued to all military personnel in Europe. The purpose was to deny Army facilities for the exchange or transmission of funds derived from sources other than cash pay and allowances received in the theater. The initial declaration in an individual's book could not be an amount greater than 3 months' net cash pay, less amounts transmitted outside the theater during the same 3-month period. This system of currency control became necessary because prior to the adoption thereof, the armed forces, through the operations of their finance offices overseas under the then existing regulations, had become engaged in large-scale foreign-exchange operations in the course of which they had accumulated substantial holdings of foreign currencies in excess of dollars appropriated by Congress which could properly be used to convert the holdings of foreign currencies into dollars. [4] This became a serious problem. *213 Under Circular No. 130, promulgated on September 13, 1946, all official use of foreign currency by military personnel was forbidden, effective September 14, 1946. This order was kept secret and only key personnel were notified 2 or 3 days in advance that there would be a changeover from military marks to military scrip. Beginning on the changeover date, September 14, 1946, called C Day, all military personnel in the German area were required to turn in allied military marks as well as native German marks. These were exchanged at the rate of 10 cents for each mark, and military scrip was issued in the same denominations as United States currency to each person. The changeover had to be effected for all personnel within 10 days from September 14, 1946. Thereafter, all military personnel were paid in military scrip and finance officers could not accept military marks or native marks for conversion into dollars or scrip, but foreign currencies could be purchased from finance offices. With the issuance of military scrip, all currency control books were ordered destroyed. Effective September 14, 1946, the official currency of the Armed Forces in Europe was military scrip and no foreign *214 currency could be used for normal business transactions of the Armed Forces. Military scrip was in use in Germany during 1947. Harold's pay from the Army consisted of base pay and subsistence and rental allowances. Deductions were made from his total pay for Class E allotments (monthly sums which were sent home by the Army to his parents whom he claimed as dependents), insurance, war bonds, field rations, and, perhaps, some other miscellaneous items. After such deductions, Harold received cash, net pay under types of payments discussed later. During his Army service, Harold received net pay in the total amount of $9,436.58, during the years 1942-1947. The following schedule shows Harold's total base pay plus allowances, the total deductions taken, including those for Class E allotments, and his net cash pay: Gross Pay
with
Total
Net
Year
Allowances
Deductions
Cash Pay
1942
$ 397.00
$ 46.20
$ 350.80
1943
1,927.80
651.30
1,276.50
1944
2,952.80
1,886.70
1,066.10
1945
3,601.45
1,834.15
1,767.30
1946
4,383.03
1,866.45
2,516.58
1947
3,052.85
593.55
2,459.30
$16,314.93
$6,878.35
9,436.58
In order to obtain Class E allotments, *215 to be sent home to his parents, Harold had to sign an affidavit each month, provided by the Army, in which he certified to the purpose of obtaining allowances from the Government for dependents. He executed such affidavits, in which he stated that his mother, or parents, were in fact dependent upon him for chief support. Harold's Class E allotments, which were sent to his parents while he was in the Army, totaled $4,210. The following schedule sets forth the total amount of the Class E allotments sent to his parents in each year: Year
Amount
1942
$ 0
1943
270
1944
1,240
1945
1,080
1946
1,080
1947
540
$4,210
During 1946 and 1947, Harold sent funds to Anna, Ernest, and Melvin through the P.T.A. He sent them $2,060 during 1946, during which year his net pay amounted to $2,516.58. He sent them $480 during 1947, during which year his net pay was $2,459.30. The following schedules show the transmissions through P.T.A. during 1946 and 1947: 1946
Voucher
No.
Date
Anna
Ernest
Melvin
287167
2/14/46
$ 100
$ 10
$ 10
292803
2/19/46
140
10
10
327094
3/25/46
120
10
10
359114
4/22/46
120
10
10
4605
7/ 9/46
160
10
10
417021
6/21/46
160
10
10
16591
7/24/46
180
10
10
34441
8/21/46
210
10
10
50770
9/19/46
220
10
10
69138
10/22/46
200
10
10
94321
12/ 5/46
230
10
10
$1,840 $110 $110
1947
122463
1/17/47
$ 220
$ 10
$ 10
129901
1/28/47
220
10
10
$ 440
$ 20
$ 20
*216 Harold, when preparing personal transfer accounts, sometimes used the name of a remitter without his knowledge or a ficitious remitter name. Two instances of such practice were traced by the respondent. They were the following: Fictitious or
Date of
Unauthorized Remitter
Payee
Amount
Transmittal
Captain Rodden
Irving Wolf
$ 800.00
2/14/46
1st Lt. Roberson
Edward Kaplan
700.00
3/25/46
$1,500.00 Irving Wolf and Edward Kaplan are friends of Harold, who lived in Chicago. Each, upon receiving United States Treasury checks for the above transmittals, endorsed the check made payable to him and gave the check to a member of Harold's family. Harold had in his finance office, checks sent from the United States to service personnel in his area, drawn on banks in the United States and made payable to a serviceman or a member of his family. In some instances Harold cashed the checks for a serviceman; in others, the check had been left in the finance office for deposit in a savings account and record of such deposit was made; the account was credited with the amount of the check; and the account earned interest on the deposit. The respondent traced *217 and produced evidence relating to 25 of such checks which were sent by Harold, through some device of his own, to his mother or some other member of the Goodman family who endorsed the checks and either cashed them or deposited them in a bank account in Chicago. By whatever method Harold used, there was no loss to the individual in the military service to whom the check was made payable and his procedure did not bring about any unbalance or loss in his accounts. His accounts were always in balance and his procedure was not detected until after his discharge from the Army. The Army never has made any known complaint or instituted any proceedings against Harold because of his diversion of these checks. His accounts remained in balance apparently because he substituted funds of some sort having an equal value in dollars for the full amount of the checks which he sent home. By regulations, checks accepted in a finance office were required to be restrictively endorsed by the finance officer "Payable to the Treasurer of the United States." Harold, of course, did not place that restrictive endorsement on the checks which he sent home. He violated Army regulations in diverting and sending *218 the checks to members of his family. The total amount of the diverted checks is $18,542.47, of which those drawn by the original makers or payors in 1946 totaled $16,213.45, and those drawn by the makers in 1947 totaled $2,329.02. In the following schedule, the 25 checks are listed showing the names of the original payees (military personnel), the dates when the checks were written, the amounts, the member of the Goodman family who was the last endorser, the dates the checks cleared through a clearing house, i.e., the dates cashed, the bank accounts in which they were deposited, or what application of them was made: Check
Goodman
Date
Deposit
Original Payee
Date
Amount
Endorsed
Cashed
or Use
Lester H. Myers
3/22/46
$ 300.00
Anna
6/ 5/46
H & O Checking
Edward T. Cox
7/17/46
73.13
Oscar
8/13/46
H & O Checking
R. H. McNichol
5/27/46
100.00
Oscar
8/17/46
H & O Checking
R. H. McNichol
5/27/46
100.00
Oscar
8/17/46
H & O Checking
Muriad Caouette *
7/11/46
656.50
Oscar
10/ 2/46
H & O Checking
Francis W. Collier *
1/ /46
100.00
Oscar
10/24/46
H & O Checking
Theodore G. Brown *
9/26/46
200.00
Oscar
10/29/46
H & O Checking
Sachio Saito *
8/22/46
300.00
Anna
11/13/46
H & O Savings X1293
Harry G. Peters *
10/17/46
685.55
Anna
12/21/46
69th & Ashland
H. K. Lemcke *
9/28/46
8,037.51
Anna
12/24/46
B & A Savings XX3103
Robert E. Lee *
11/ 6/46
1,409.92
Anna
12/26/46
69th & Ashland
Genevieve Finley *
10/24/46
300.00
Oscar
1/ 2/47
H & O Checking
Florence L. Lemcke *
10/15/46
1,500.00
Anna
1/ 2/47
B & A Savings XX3103
Patrick J. McGrath
9/18/46
200.00
Oscar
1/ 7/47
H & O Checking
John Beanland
11/30/46
100.00
Oscar
1/10/47
H & O Checking
Roy F. Counts
12/ 9/46
1,906.33
Anna
1/16/47
A Savings XX2226
John Moquin
12/21/46
130.00
Anna
1/16/47
A Savings XX2226
Barbara Rice
12/10/46
114.51 **
Oscar
2/21/47
H & O Checking
Subtotal
$16,213.45
L. H. McCormick
1/11/47
150.00
Benjamin
1/11/47
Not known
Bert Klein
1/21/47
200.00
Anna
2/11/47
A Savings XX2226
Richard McMichael
1/22/47
100.00
Anna
2/11/47
A Savings XX2226
Arnold G. Smart
1/ 6/47
600.00
Anna
2/11/47
A Savings XX2226
John Moquin
1/21/47
50.00
Oscar
2/21/47
H & O Checking
Walter Browder
1/21/47
500.00
Anna
3/ 5/47
A Savings XX2226
Albert Jones
1/29/47
729.02
Anna
3/ 8/47
B & A Savings XX3103
Subtotal
$ 2,329.02
Total
$18,542.47
*219 During the respondent's investigation of the income tax liabilities of all of the petitioners, his agents found out that members of the Goodman family in Chicago deposited all but three of the 25 checks payable to servicemen listed above in bank accounts, of which four were involved, namely; (1) a checking account in the Mutual National Bank in the names of Harold and Oscar; (2) a savings account in the names of Harold and Oscar in the Mutual National Bank, No. X1293; (3) a savings account in the Mutual National Bank in the names of Benjamin and Anna, No. XX3103; and (4) a savings account in the name of Anna in the Chicago City Bank & Trust Company, No. 312226. The respondent's agents learned that in December 1946, 2 of the checks were used by Anna toward the payment of the purchase price of the 69th & Ashland property, namely, checks payable to Harry G. Peters and Robert E. Lee (see the above schedule), and that a check payable to L. H. McCormick for $150 was cashed by Harold's father. In the following schedule a synopsis is *220 made of the deposits of checks payable to servicemen in the bank accounts and the immediate uses of three of the checks: (1) H & O Checking Account,
Mutual Bank
Deposited in 1946
$ 1,529.63
Deposited in 1947
764.51
$2,294.14
(2) H & O Savings Account, X1293,
Mutual Bank
Deposited in 1946
$ 300.00
(3) B & A Savings Account,
XX3103, Mutual Bank
Deposited in 1946
$ 8,037.51
Deposited in 1947
2,229.02
$10,266.53
(4) A Savings Account, XX2226,
Chicago City Bank
Deposited in 1947
$ 3,436.33
(5) Purchase of 69 & Ashland,
1946
$ 2,095.47
(6) Cashed by B., 1947
$ 150.00
Total
$18,542.47
Harold sent home, at least, $20,853.45, in 1946, and $3,349.02 in 1947, as follows: 1946
1947
Class E Allotments
$ 1,080.00
$ 540.00
P.T.A. name of Harold **
2,060.00
480.00
P.T.A. fictitious names **
1,500.00
0
Checks of others *
16,213.45
2,329.02
$20,853.45
$3,349.02
In preparation for returning to the United States, Harold's duties as the chief finance *221 officer at his base ended on February 28, 1947, but he remained at Fuerstenfeldbruck until some time in May. He sailed from Bremerhaven, Germany, in June 1947. Harold purchased American Express travelers checks in Germany before returning to the United States in the total amount of at least $1,600, and he acquired travelers checks of servicemen in the total amount of at least $450, or a total of at least $2,050, all of which were cashed by Harold in 1947 after he returned to the United States. While he was at Fuerstenfeldbruck, Harold became acquainted, in the fall of 1945, with a German national, Beatrice Bareiss. He spent a great deal of his free time with her in the evenings during the week and during weekends. In January 1947, Harold decided to stay in Germany because he knew that his parents would not allow him to come home if he married a German girl. He, thereupon, applied for reenlistment in the regular Army but was rejected. He then applied for a civilian position in Germany and secured in March 1947 a position as chief accountant with the Military Government in Bavaria. He notified his mother of his plans to stay in Germany, but his mother asked him to come home because *222 his aunt was dying and his father had become deaf. Harold Goodman and Beatrice Bareiss intended to be married prior to Harold's return to the United States and he applied for permission to bring her to the United States. Harold's Activities After Returning Home Harold returned to the United States upon due consideration of his mother's request, and at the time of his arrival home, his aunt, Sara Faber, was close to death. She gave him $10,000 in cash which Harold turned over to his mother. Harold opened a checking account in his sole name on August 16, 1947, in the Standard State Bank of Chicago. Part of his initial deposit in the amount of $998.65 consisted of 7 American Express checks, in the total amount of $300, and the rest consisted of 2 checks drawn on Chicago banks, one in the amount of $468.30, and the other in the amount of $230.35, or a total or $698.65. From the establishment of this account until December 31, 1947, there was a total of $8,467.54 of deposits and a total of $7,471.08 in withdrawals, leaving a balance of $996.46. On August 25, 1947, Harold and Anna Goodman rented a safe deposit box as joint tenants at the Standard State Bank. The following are the *223 dates of entry to the box in 1947, and all were made by Harold. Aug. 25
Oct. 2
Oct. 30
Sept. 4
Oct. 8
Nov. 12
Sept. 16
Oct. 14
Nov. 13
Sept. 22
Oct. 16
Nov. 22
Sept. 23
Oct. 21
Dec. 4
Sept. 25
Oct. 23
Dec. 8
Upon his return to Chicago, Harold was occupied in the following pursuits: He assisted his parents in the management of their apartment buildings and the collection of rents; he undertook learning how to buy and sell commodities on the commodities exchange and received instructions about market forecasting from a specialist named Daniel; he also worked with his mother on transactions involving the purchases of the 2 properties at 83rd & Racine and 91st & Laflin, which were in the same section of Chicago as the other properties owned by the Goodmans. In July 1947, a Pontiac automobile was purchased from the North Shore Buick Company for $1,752.43. The title to the automobile was in Harold's name. Payment was made in cash which included a travelers check for $100 purchased in Germany by Harold. Harold's mother provided all of the money for the purchase except $100. Harold became interested in the commodities market in July 1947 and decided *224 to open a trading account with the Daniel F. Rice Company. Later, in September, his mother asked him to open a similar account for his brother, Oscar. Harold opened that account on September 26, 1947. During 1947, funds were deposited in Harold's account in the total amount of $19,600, and deposits of $16,260.74 were made in Oscar's account. At the end of 1947, the credit balance in Harold's account was $14,641.25, and the credit balance in Oscar's account was $17,795.74. Harold's account showed a short-term capital gain of $2,041.25 in 1947 which he reported in his return. As stated before, Oscar's account showed a short-term capital gain of $3,135 which he reported in his return. Harold's account with Rice was opened with a deposit of $5,000 advanced to him by Anna who withdrew that amount from her savings account XX2226 at the Chicago City Bank in August. In September, Anna advanced an additional $5,000 which she withdrew from the savings account of herself and her husband, XX3103, in the Mutual National Bank. In September, also deposits were made in the account of cash totaling $7,200, and Harold deposited $800 in travelers checks. In November a deposit of $1,600 was made in *225 the account. This sum was withdrawn from Oscar's trading account by a check payable to Oscar, who endorsed the check and gave it to Harold; Harold deposited this amount in his trading account; total deposits, $19,600. The deposits of $16,260.74 in Oscar's account consisted of $8,150 in cash, $1,500 in Harold's travelers checks, and 3 checks totaling $6,610.74, funds borrowed upon refinancing and increasing the mortgage on the 83rd & Racine property. Anna reimbursed Harold with $1,500 in cash. In August 1947, Harold learned that the property at 83rd & Racine, an apartment building, was for sale, and he notified his parents; they examined the building; and they told Harold to make an offer of an amount $5,000 less than the asking price, which he did. The property was sold, however, to Sam Adams and M. Bright. Anna and Benjamin then made efforts to purchase the property from Adams and Bright through the Goodman's lawyer, Hess Rubin, and a purchase was arranged. The purchase price was $111,000, subject to a mortgage of $74,269.76, which was assumed. Adjusting credits of $296.07 were allowed, and the net amount of cash paid was $36,434.17. That amount of cash was made up of the following: *226 $5,000 was drawn from savings account 123103 of Anna and Benjamin in the Mutual National Bank; $11,000 was drawn from the checking account of Harold in the Standard State Bank; $20,000 was used, and a personal check of Harold for $434.17, drawn on the Mutual checking account in names of Harold and Oscar. The mortgage was refinanced and increased, as of December 31, 1947, to $80,000, and the net proceeds so obtained were deposited in the trading account of Oscar, in the amount of $6,610.74. The Racine property was held in a land trust, Trust 7426 and the form of holding title was as the sole beneficiary of the trust. On September 27, 1947, M. Bright conveyed the beneficial interest in this trust to Harold. On March 17, 1948, Harold transferred the beneficial interest to Benjamin and Anna. On May 15, 1948, they reconveyed the beneficial interest to Harold. Benjamin and Anna were interested in purchasing another apartment building in their neighborhood or area and contacted one of the owners of a 16-apartment building at 91st & Laflin, a man named Kumpke with whom there were negotiations and a tentative agreement on the price. On October 10, 1947, the sale was closed. Kumpke was *227 represented by Muholland and Harold represented his parents. The selling price of the Laflin property was $82,500, less $957.72 for certain adjustments, or the net amount of $81,542.28. A mortgage loan of $35,000 was obtained: The rest of the cash required, $46,542.28, consisted of the following: $8,500 was withdrawn from the savings account of Anna and Benjamin in the Mutual Bank, XX3103; Anna withdrew $4,863.33 from her savings account XX2226 in the Chicago City Bank. Harold withdrew $5,000 from his trading account with Rice. These amounts total $18,363.33. (It is noted that Anna had advanced $5,000 to Harold to deposit in his trading account). The balance of the cash used, $28,178.95, was supplied in the following way: Harold deposited $3,042.28 in currency with the escrowee; he purchased a cashiers check for $16,136.67 (the equivalent of cash); he provided an additional $3,000; and he withdrew $6,000 from the joint savings account, X1293, in the names of himself and Oscar in the Mutual Bank. Title to the Laflin property was held in a land trust of the Pullman Trust & Savings Bank, Trust 3557. Upon the sale above described, Harold was made the sole beneficiary of the trust. On *228 April 5, 1948, he assigned his interest to Benjamin and Anna, and on August 18, 1948, they reconveyed the interest to Harold. The property was sold on June 30, 1950, when Harold conveyed the interest to the purchaser. Harold reported the income from the Racine and Laflin properties in his return for 1947. For the Racine property a net operating loss of $127.82 was reported; for the Laflin property, a net profit of $333.20 was reported. During 1947, $353.36 was paid on the Laflin mortgage reducing it to $34,646.64. The savings account, XX3103, of Benjamin and Anna in the Mutual Bank was opened on December 20, 1946, and in that account checks of servicemen totaling $10,266.53, which Harold sent home, were deposited in 1946 and 1947. Other deposits in the account totaled $8,193.88, and there was interest of $47.68. This account was closed on September 30, 1947. The total amount of $18,500 which was withdrawn from this account was used as follows: $8,500 in the purchase of the Laflin building, $5,000 in the purchase of the Racine building, and $5,000 as a deposit in Harold's trading account with Rice, which amount later was withdrawn and used in the purchase of the Laflin building. *229 Anna's savings account XX2226 in the Chicago City Bank was opened on January 15, 1947, and it was closed on September 30, 1947. There were deposits of $9,863.33 in the account. That amount was withdrawn in 2 withdrawals of $5,000, which was deposited in Harold's account with Rice, and $4,863.33, which was applied in the purchase of the Laflin building. $3,436.33 of the deposits were checks of servicemen which Harold sent home from Germany. In July 1947, soon after his return home, Harold told his parents that he intended marrying Beatrice Bareiss. His parents had strong objections. Anna told Harold that in view of the imminent ending of rent control, she and her husband were looking for and planning to purchase additional apartment properties and that if he would agree not to marry Beatrice, they would give him two buildings. Harold agreed not to marry Beatrice and by letter and cablegram he told her not to come to the United States. In accordance with their promise to Harold, Benjamin and Anna gave instructions to put the titles to the Racine and Laflin properties in Harold's name when each was purchased, and they made gifts of these properties to Harold. Beatrice, however, *230 came to the United States in December 1947. Harold, in March 1948, decided that he would marry her, after all, and transferred the title to the two properties to his parents. Later in 1948, he was persuaded again not to marry Beatrice and the titles to the properties were transferred back into Harold's name. Beatrice eventually married Dietrichstein and remained in the United States. She testified at the trial of these cases. Harold filed his first income tax return in 1941. He filed no income tax returns for 1943-1946, inclusive, since he was in the Army and he had no taxable income. All military personnel received a $1,500 pay exclusion and allowances were not taxable. There was no necessity for Harold's maintaining any account records while he was in the Army. In 1947, there were records of the commodities brokerage account in Harold's name, as well as the account in Oscar's name, consisting of the broker's records and the customer's statements provided by Rice and Company. Although Harold did not keep an accounting record of the receipts and disbursements of the Racine and Laflin properties, the respondent has never questioned the amounts with respect thereto reported in *231 Harold's 1947 return. As of December 31, 1946, Harold owned United States savings bonds costing $1,912.50, and as of December 31, 1947, he had United States savings bonds of $2,250. The balance in Harold's checking account in the Standard State Bank at the end of 1947 was $996.46. Harold was indicted by a Federal Grand Jury in Chicago, on March 13, 1953, on charges that he had unreported income, in violation of section 145(b), 1939 Code, of $71,137.72 in 1946, and $106,344.08 in 1947, and that he had wilfully attempted to evade payments of income tax on such amounts of income. The Government moved for dismissal of the indictment in 1955. Ultimate Findings of Fact The postal savings account in the name of Harold, 08156, was never solely his account and was not his account after 1943. At the end of 1943, the balance in the account was $1. The account was used by Benjamin and Anna and the funds on deposit belonged to them. Beginning in 1945, the joint checking account in the names of Harold and Oscar in the Mutual National Bank was the bank account of and belonged to Benjamin and Anna; the balances therein are not includible in the assets owned by Harold at the end of 1946 *232 and 1947. The sum of $434.17 withdrawn from this account in 1947, which was used in the purchase of the Racine property, was a withdrawal of money belonging to Harold's parents. The joint savings account in the names of Harold and Oscar in the Mutual National Bank, 91293, was not Harold's account. Most of the money in this account was drawn out in 1945, while Harold was overseas, when $1,800 was withdrawn on April 17, 1945, leaving a balance of only $148.49. A deposit of $1,800 was made on the purchase of the 82nd & Ada property on July 24, 1945. Deposit slips for deposits in this savings account were made in Anna's handwriting. The withdrawal of $6,000 from this account in 1947, used in the purchase of the Laflin building, was a withdrawal of money belonging to Harold's parents. The balances in this savings account are not includible in assets owned by Harold in 1946 and 1947. When Harold went overseas in October 1943, he had served in the Army over 1 year and had some savings which he took with him in the amount of $1,000. He declared this cash, except about $200, when he arrived in Stone, England, and turned into the finance office there $800. When Harold left Germany to return *233 to the United States in May or June 1947, he had some cash savings which he brought with him. Some of such funds were in American Express travelers checks but he also carried cash. Upon arrival in the United States, he had at least $2,800 in travelers checks of which $450 were travelers checks which Harold cashed for servicemen before leaving Germany and during the voyage home. Harold had funds of his own on hand at the end of 1946 in excess of $1,886.90, the amount determined by the respondent in the revised net worth statement. At the end of 1946, Harold had on hand cash of his own in the amount of not less than $3,000, which represented his savings. Benjamin gave Harold $40,000, in bills of the denomination of $100, before he went abroad in October 1943. Harold took this money overseas and, in small parcels, he put it in among the belongings he took with him. He did not declare this money when he arrived in England, or later, and did not turn it in at a finance office. He exchanged it in France in the summer of 1945 for French francs, and when he was transferred to Germany, he exchanged the francs for allied military marks. Such conversions of dollars were made by Harold during *234 the time that the authorized military procedure was to carry on official monetary transactions in the currencies of the European countries where troops and military bases were located and conversions of dollars to local or military currencies, and vice versa, were allowed officially. While Harold was overseas, he returned $35,000 of this fund to his parents through personal transfer accounts and personal checks of servicemen which he cashed or diverted. He brought back with him in 1947 $5,000 of this fund, the balance. There is no proof that Harold engaged in blackmarket transactions in currencies or commodities while he was in Europe and no charges against him to that effect are known. Respondent included in Harold's revised net worth statement the total sum of $4,665.35 as 1947 income. Of this sum, $540 was the nontaxable Class E allotment in 1947 which Harold sent home, and the balance, $4,125.35, represented part of the fund belonging to Benjamin, mentioned above, which Harold returned in the media of P.T.A. transmittals and checks of servicemen which he had cashed or diverted. $4,665.35 was not taxable income of Harold. The Pontiac automobile purchased in 1947 was an asset *235 of Harold's parents for which they paid $1,652.43 and Harold contributed $100. Due to the shortage of automobiles in 1947 and the preferences allowed veterans, Harold arranged for the purchase and took title in his name so that his parents could obtain an automobile. The account with Rice and Company in the name of Oscar was Oscar's trading account in which deposits totaling $9,650 were provided by Anna from her own funds. It was not an asset of Harold. In Harold's trading account with Rice, Anna advanced $17,200. Harold deposited $800. The balance of $1,600 was transferred from Oscar's account. The cash used in the purchases of the Racine and Laflin properties in 1947, other than borrowed funds, were provided by Benjamin and Anna out of their own cash funds and by withdrawals of their own funds in the checking and savings accounts in the Mutual Bank in the names of Harold and Oscar, which were their bank accounts in 1947, and before. Such funds of Benjamin and Anna, so used, included $11,000 withdrawn from the bank account of Harold at the State Bank, which belonged to them; the check for $434.17 drawn on the Harold and Oscar checking account in the Mutual Bank; $6,000 withdrawn *236 from savings account X1293 in the names of Harold and Oscar in the Mutual Bank, which was an account of Benjamin and Anna; and cash totaling $22,178.95 paid over by Harold at the title closing when the Laflin property was purchased, which he had received from Anna. The Racine and Laflin properties were not purchased by Harold. All of Harold's income during 1947 was derived from his Army pay, transactions in commodities through Rice and Company, and from the Racine and Laflin buildings, as reported in his 1947 return. During 1947, Harold did not engage in any other income-producing activities or have any income from any other sources. He reported all of his taxable income for 1947, namely, gross income of $2,414.22 and net income of $888.09. In May, 1943, Benjamin and Anna had on hand accumulated cash savings, which they kept at home, which amounted to $160,000, which represented their lifetime savings. They had a substantial residue of this fund of accumulated cash at the end of 1945 and 1946, which was not deposited in banks. They had undeposited cash on hand, also, at the end of 1947. The respondent's final net worth statement for Benjamin and Anna does not establish a sound *237 opening net worth for the Goodmans. In 1945, 1946, and 1947, and at the end of each year, the following bank and savings accounts belonged to Benjamin and Anna and the funds on deposit in each one were their funds: The joint checking and savings (X1293) accounts in the names of Harold and Oscar in the Mutual National Bank, and postal savings account 08156 in the name of Harold. The Pontiac automobile purchased in 1947 in the name of Harold was an asset of the Goodmans. In 1946 and 1947, Benjamin was not engaged in a business of buying, reconditioning, and selling stoves, furniture, and refrigerators, other than such items as were in apartments owned and rented by himself and his wife. It was customary at all times material, before and during the taxable years, for the Goodmans to retain and keep at home, undeposited, the rents paid to them in cash by tenants; they deposited in bank accounts, usually, only rents paid to them by checks. During 1946 and 1947, Benjamin and Anna derived all of their income from the operation of their 3 apartment buildings and the stores and office building at 69th & Ashland. Benjamin and Anna did not engage in any other income-producing activities *238 in 1946 and 1947. For 1946 and 1947, Benjamin and Anna understated their income in the amounts, respectively, of $5,252.83 and $8,401.69, of which amounts $4,083.59 and $7,296.19 was income which they received and failed to report. Part of the deficiencies for 1946 and 1947 were due to fraud with intent to evade tax. Opinion In the cases of Benjamin and Anna, the evidence establishes that they received and did not report income from real estate in 1946 and 1947 in the amounts of $4,083.59 and $7,296.19, and that in their returns deductions were excessive in the amounts of $1,169.24 and $1,105.50. Therefore, their unreported income for 1946 and 1947 was $5,252.83 and $8,401.69, respectively. These additions to income result from specific adjustments in the petitioners' returns. It is the contention of the respondent that there was a substantially larger amount of unreported income for 1946 of about $57,000, roughly, and that for 1947, there was additional unreported income of roughly, $21,000, or more, depending upon the findings made in the case of Harold, the additional amounts of alleged income being indicated by respondent's final net worth statement in each case. The petitioners *239 contend that a substantial amount of undeposited cash was owned and held by Benjamin and Anna at the end of 1945 and that it, only, is the source of expenditures made in 1946 and 1947 for the purchases of real estate and an automobile, the establishment of trading accounts with Rice and Company in the respective names of Harold and Oscar, and the payments in reduction of mortgage loans on real estate and other debts. They contend, further, that their only sources of income in the taxable years were the operations of 3 buildings in 1946 and 6 buildings in 1947 (the Ashland building having been acquired at the end of 1946) and, in the case of Harold, his transactions in commodities in his trading account with Rice and Company. It is argued that from these sources it was impossible for the Goodmans in 1946 and 1947, and for Harold in 1947, to have realized taxable income in the total amounts claimed or determined by the respondent; that there is evidence establishing the existence in the period involved of undeposited and nontaxable funds; that all possible sources of nontaxable funds have not been negated; that the respondent's net worth statement for the Goodmans is arbitrary and unrealistic *240 because he failed to allow a sound opening net worth; and that respondent's net worth statement for Harold is arbitrary and incorrect because it includes assets which either he did not purchase or own. In the case of Harold, respondent's theory involves the implication that in 1947 there were likely sources of taxable income consisting of gains from engaging in soldiers' gambling games (dice and cards) and blackmarket transactions in currencies or, possibly, commodities. However, he admits that there is no proof that Harold engaged in blackmarket transactions. We shall discuss first this aspect of Harold's case. There is no proof that Harold played gambling games during 1947 in Europe, on the return trip, or after he returned. Respondent attempted to establish this fact through the testimony of a few witnesses who had been in the Army at Fuerstenfeldbruck or on the same ship on the voyage home. The testimony does not establish that Harold gambled. He denies that he did at any time in 1947. The respondent produced 25 checks made payable to servicemen or members of their families which bear endorsements of individual members of the Goodman family other than Harold. Harold now admits *241 that he sent these checks home; the respondent established that fact. The total amount of these checks is $18,542.47. Harold obtained more than one check from some of the individuals, so that although there are 25 checks only 22 individuals are involved. The respondent introduced the testimony of 13 of these individuals. Each testified that, if he had cashed a check, he received the full amount of the check, no more and no less, or, if a check was deposited in a soldier's savings account, it was credited with the full amount of the check. Thus, there is nothing in the testimony of these individuals which establishes that Harold realized any profit in connection with the checks which he sent home, and in general, there is no proof that he realized profit. No charges have been made by the Army, and no proceedings have been instituted against Harold for any illegal or irregular currency transactions during his military service. Harold received commendations, based upon superior ratings, for his operation of his finance office in Germany. There is no proof that Harold carried on blackmarket transactions or that in some way he realized income in 1947, or before, from any transactions *242 while he was in the Army. Cf. Smith v. United States, 126 F. Supp. 433, involving an Army finance officer who engaged in blackmarket operations in currencies; and United States v. Roberson, Law No. 4920, Circuit Court of Fairfax County, Virginia, November 18, 1953. It was, of course, contrary to regulations for Harold to divert checks of servicemen into channels other than those prescribed by the Army and the Treasury, but this fact alone does not establish that he realized income from his irregular procedures. Harold's explanation of this particular procedure involves an unusual story, the details of which are not material; the following is sufficient: Before Harold went abroad in 1943, Harold's father, Benjamin, asked him to undertake a mission which was of serious personal concern to Benjamin, which required Harold's going to Russia, if possible. In order to accomplish the objective, if possible, Benjamin gave Harold 4 packages containing 100 pieces of United States currency in the denominations of $100 each, or $10,000 per package, a total of $40,000. In May 1943, Harold had reason to believe that he was to be sent to Europe. Harold applied for assignment to Russia, *243 upon arriving in England, but he was unsuccessful. It was understood that if Harold could not carry out the mission, he would return $40,000 to his father. When Harold was at Le Bourget, in the spring of 1945, his duties consisted primarily of exchanging European currencies for American dollars, and vice versa. At this time local currencies were used in the official operations of the Army in Europe and under Army regulations servicemen were allowed to exchange, at official rates of exchange, European currencies of all kinds for American dollars. One day in the summer of 1945, there was a sudden influx of officers at Le Bourget who were exchanging European currencies for dollars and the finance office did not have a sufficient amount of dollars for making exchanges. Therefore, Harold used his parents' $40,000 in currency, exchanging that sum for French francs at the official rate of exchange, in order that the finance office would have some needed dollars. When he was in Germany, he exchanged the French francs for allied military marks at the official exchange rate. He then decided to return as much of the $40,000 to his parents as possible from Germany. However, in order to do so, *244 he had to convert the currency which he had into dollars, and he did. He then sent dollars to his parents through P.T.A. and by mailing home checks payable to servicemen. He substituted equal amounts of the particular currency he had for the dollar amounts of the checks, and he claims that he did so at the official rates of exchange, and, therefore, he did not realize any profit. The accounts in his finance office remained in balance. He testified that in this way he sent his parents $35,000, and brought the balance, $5,000, with him in 1947. That is his explanation. The question is whether Harold derived income in 1947 in connection with these funds. There is no proof that he did, and no one who testified, including those who had been closely associated with him in Germany, observed actions or circumstances leading them to believe that Harold had engaged in blackmarket or other profitable transactions. We cannot find upon the record that he realized income in 1947 consisting of or related to the funds in question. Respondent advances only a circumstantial and inferential theory. In the record are testimony about Army currency controls in 1945 and 1947 and a volume of testimony at *245 hearings of Senate Committees (see footnote 4). They show that in Germany there were complicated currency problems under Army policies about legal exchanges of local and military currencies for dollars. All of this indicates that speculation about conjectural possibilities of what might have occurred many years ago in Germany merely because of then existing conditions should not be substituted for proof of facts. Otherwise, injustice may be the product of suspicion. We must recognize the difficulties of proof in later years and because of them give due weight to the uncontradicted testimony of petitioner and his witnesses. Respondent did not refute or impeach their testimony. The very lengthy and detailed record before us has been carefully examined at great length. Under all of the circumstances, despite the unusual nature of Harold's explanation of how and why he diverted checks of servicemen to his parents and used unauthorized P.T.A. transfers, we are unable to conclude that Harold's explanation is incredible. Upon consideration of the entire record, we are unable to conclude that there was any likely source from which Harold in fact derived income during 1947 other than the *246 trading account which he had with Rice and Company and the operations of the Racine and Laflin buildings. With respect to the latter, there is no basis in the record for concluding that more income was realized from the operations of the properties than Harold reported in his return. As is discussed hereinafter, it is evident that Harold's parents had a substantial amount of cash during 1947, and before. Harold introduced evidence showing that his parents provided the funds for assets held in his name. Harold claims that the Racine and Laflin properties were purchased by his parents with their funds and that his parents gave the properties to him in return for his promise not to marry Beatrice Bareiss. His explanation is, again, unusual, but in this instance it is less extreme than his other explanations; it is as follows: The Goodmans are members of the Hebrew race; Beatrice is not and, furthermore, she is a German national. Harold told his parents after he returned home that he intended to marry Beatrice. They objected so strenuously that they promised to give him two apartment properties which they planned purchasing if he would agree not to marry Beatrice. He agreed, and when *247 his parents made such purchases they gave the properties (Racine and Laflin) to Harold. Beatrice testified, also, that before Harold left Germany plans had been made for their marriage. It is not incredible that the Goodmans objected to the proposed marriage. Furthermore, there is no proof that Harold had sufficient money of his own to purchase the Racine and Laflin properties. It is concluded that the Goodmans purchased them and gave them to Harold. It follows that the fact that both properties were held in Harold's name does not represent increase in Harold's net worth in 1947 and respondent's net worth statement is incorrect. Also, there is evidence that Harold did not provide the funds for acquiring other assets included in the respondent's net worth statement, and that certain bank and savings accounts included therein did not belong to Harold. Harold had the burden of overcoming the prima facie correctness of the respondent's determination. We are satisfied that he introduced evidence which is sufficient to overcome such presumption. The respondent did not introduce the proof required in this situation from which it can be found that Harold realized any more income in 1947 *248 than he reported. Helvering v. Taylor, 293 U.S. 507; Durkee v. Commissioner, 162 F. 2d 184, 187; Gasper v. Commissioner, 225 F. 2d 284. It is concluded that in 1947 Harold did not have income which he failed to report. It follows that there is no deficiency for 1947; therefore, the fraud penalty falls. In the case of Benjamin and Anna, the respondent has the burden of proving that they had additional income in each year as he has alleged affirmatively in his amended answer and claims under the net worth method. The matter of the respective burdens of proof of the petitioners and the respondent in the Goodmans' case requires comment, perhaps, and for clarification, at least, the following is noted: Originally, on the basis of specific adjustments of items reported in the returns and of additions to income reported, the respondent determined deficiencies and fraud penalties. Petitioners conceded none of such adjustments. They had the burden of proving errors in the determination; respondent had the burden as to fraud. Certain evidence was presented by both parties relating to the specific adjustments and since they involved questions of fact, *249 the petitioners on brief let those matters rest as ones which had been taken care of at the trial upon the presentation of evidence. At the trial, respondent adopted a new theory about alleged unreported income because he resorted to the use of the net worth method of reconstructing the Goodmans' income after issuing the deficiency notice; and, therefore, he filed an amended answer in which he made affirmative allegations that the Goodmans' income for both years was greater than originally determined. He made claims for increases of the deficiencies under his new theory. The respondent then had the burden of proof under his affirmative allegations which involved his belated resort to the net worth method and claims for increases in the deficiencies. One of the reasons why he then had burden of proof was that he adopted a new theory. See Sheldon Tauber, 24 T.C. 179; Estate of William Beale Hibbs, 16 T.C. 535. All of the record has been carefully considered. It is concluded that he failed in meeting his burden of proof. He attempted to prove that there were substantial increases in the Goodmans' net worth in 1946 and 1947. Petitioners did not concede that *250 there were and very few facts were stipulated. The record, which includes over 1200 pages of testimony and 162 exhibits, establishes that expenditures were made for the acquisition of assets, reductions of indebtedness, and that cash was deposited in several bank accounts. In this respect, the respondent's evidence deals chiefly with cash expenditures which he has established. However, in order for the respondent to prove the existence of income by the increase in net worth method, it is essential that he prove a sound opening net worth, for the correctness of a worth analysis depends entirely upon the inclusion at the outset of all assets on hand. Holland v. United States, 348 U.S. 121; Phillips' Estate v. Commissioner, 246 F. 2d 209; Harp v. Commissioner, 263 F. 2d 139; Fairchild v. United States, 240 F. 2d 944; United States v. Massei, 355 U.S. 595; Mertens, Law of Federal Income Taxation, Vol. 10, sec. 55.19. The issue in the case of the Goodmans has been reduced to the narrow area of whether they had a substantial *251 amount of cash on hand at the end of 1945, the opening of the net worth analysis. In other words, one question is whether the respondent under his burden of proof has negated possible sources of nontaxable funds. We conclude he did not. The Goodmans by 1945 had been married for 30 years, during which period they had engaged in several income-producing activities. Their elder sons began earning money at early ages. It was customary for them to turn over most of their earnings to their parents. We have not set forth in detail every type of income-producing activity in which Benjamin engaged in the early years; only the chief ones have been stated. He and Anna were exceedingly industrious. The Goodmans made an estimate of their gross receipts during the period 1910-1945; it amounted to over $300,000. The Goodmans contend that in May 1943, they had $160,000 in cash which was not deposited in banks. Opposed to this contention, the respondent points to instances of their borrowing funds and defaulting on payments. But the record as a whole shows that the Goodmans understood very well the advantages of establishing some kind of credit through loans and of holding onto cash and assets even *252 to the point of avoiding creditors. They pooled all cash receipts of the family, commingling funds, and consistently accumulated cash. They reduced expenses by performing the labor and services required in operating and maintaining their properties. We are unable to conclude that the Goodmans did not have a substantial amount of undeposited cash on hand at the end of 1945 in view of their 30 years of industry and frugality. The record supports the finding that they had a fund of cash, not in banks, of $160,000 in 1943. The evidence indicates that they had about $175,000 at the end of 1945. With respect to likely sources of income in 1946 and 1947, there is a good deal in the record. Respondent called many witnesses who were tenants. He made a farreaching investigation. The most he established was that the Goodmans derived income from rents and bonus payments of $4,083.59 in 1946, and $7,296.19 in 1947, which they failed to report. It is our conclusion that in the taxable years, the only source of the Goodmans' income was the operation of rental properties. From that source, the large sums of income which the respondent alleges were realized in 1946 and 1947 could not have been *253 derived. The petitioners have not requested a finding of specific amounts of undeposited cash on hand at the end of 1945, the opening of the net worth period, and the end of 1946. They were not required to do so; they do not have the burden of proof, as to the claim for increased deficiencies. In the Goodmans' case, the presumption of correctness in the respondent's favor is not present beyond the scope of the original determination. Even in cases where such presumption exists, it is not incumbent upon a taxpayer to establish the correct amount of the tax which lawfully might be imposed if he shows that the Commissioner's determination is arbitrary and excessive. Helvering v. Taylor, supra; Durkee v. Commissioner, supra; Thomas v. Commissioner, 232 F. 2d 520, 522; Thomas v. Commissioner, 223 F. 2d 83, 88. It is concluded that the respondent's opening net worth for the Goodmans is not sound and is incomplete, and because of that, the results produced by his net worth analysis are arbitrary and excessive. Helvering v. Taylor, supra. *254 It is concluded and has been found that the Goodmans' income for 1946 and 1947 was understated by no more than $5,252.83 and $8,401.69, respectively. There are, therefore, income tax deficiencies., they are somewhat lower than was originally determined. The remaining question is whether part of the deficiencies is due to fraud with intent to evade tax under section 293(b). It is concluded that the respondent has proved by clear and convincing evidence that the Goodmans' failure to report all of their receipts from the operations of their properties was due to fraud with intent to evade tax. The understatements of income were substantial and consistent in each year. Albert N. Shahadi, 29 T.C. 1157, 1169; Abraham Galant, 26 T.C. 354; J. K. Vise, 31 T.C. 220. There is proof that the petitioners, in violation of rent control restrictions, charged applicants for apartments "bonus" payments, or premiums, and attempted to conceal such charges. They also failed to report rents received at the Loomis apartments. We are not convinced that such income was reported as receipts from decorating and "handyman" services, rather than rent, as petitioners *255 contend. The record shows that the petitioners' failure to report income in the above-stated amounts was deliberate and with the intention of evading tax. Additions to the deficiencies under section 293(b), to be recomputed under Rule 50, are sustained. Decision will be entered under Rule 50 in Docket No. 43543. Decision will be entered for the petitioner in Docket No. 43544. Footnotes
1. One of the questions in these cases is whether these 2 properties were purchased by Benjamin and Anna, or by Harold.↩
2. The 2 properties, 83rd & Racine and 91st & Laflin, were held in Harold's name in 1947 and he reported the income from them.↩
3. The ultimate question before the Court is to determine what amounts, if any, of unreported income for 1946 and 1947 were realized by the Goodmans. The finding that the items and amounts of assets and liabilities and the other adjustments in the respondent's net worth statement, revised, are correct is not dispositive of the ultimate findings which may be made.↩
*. The figure $23,363.33 is the total of $18,500 and $4,863.33.↩
4. Hearings before the Committees on Appropriations, Armed Services, and Banking and Currency of the Senate, 80th Cong., 1st Sess., on Occupation Currency Transactions, June 1947, p. 3.↩
*. Checks were diverted after September 14, 1946, when military scrip became the currency in use. ↩
**. Corrected figure; error in respondent's brief.↩
**. The correct sum of the P.T.A. transfers is $3,560; petitioner's figure for this item is incorrect.↩
*. According to the year in which the checks were written. ↩